HOLLINGSWORTH *v.* LEACHVILLE SPECIAL SCHOOL DISTRICT.

## Opinion delivered February 26, 1923.

1. CONTRACTS—TERM "ARCHITECT" DEFINED.—Where, in a building contract, the term "architect" was expressly defined as referring to a designated architect with his partner as associate, and the contract makes "the architect" the final arbiter between the contractor and the school district which was having the building erected, either partner was authorized to pass on the work, and the contractor could not dispute the authority of either partner to act.

2. CONTRACTS—SUBSTANTIAL PERFORMANCE—DAMAGES.—In a building contract, a substantial compliance by the contractor is all that is required, he being charged, where there is such compliance, with the difference in value between the work as done and as contracted to be done, or the replacement of defective work where this can be done without great expense or material injury to the structure as a whole.

3. CONTRACTS—EVIDENCE.—Evidence *held* to show necessity of tearing down and removing defective work in a school building and rebuilding in accordance with original plans.

4. CONTRACTS—BUILDING CONTRACT—LIQUIDATED DAMAGES.—Where a certain sum per day was named in a building contract as liquidated damages for delay in completing the building after a named date, and the contractor threw up the job, and it was completed by another contractor, and on a cost plus basis, the original contractor was not liable for such liquidated damages during the period the other contractor was engaged in completing the work.

5. CONTRACTS—BREACH OF BUILDING CONTRACT—DAMAGES.—Where a contractor failed to complete his contract, and it was neces-

sary to employ another contractor to tear down part of the building and rebuild it, a fee paid to the architect in supervising such work as a necessary expense was properly chargeable to the original contractor.

6. CONTRACTS—BREACH OF BUILDING CONTRACT—DAMAGES.—Where a contractor failed to complete his contract, and it was necessary to employ another contractor to tear down part of the building and rebuild it, the expense of employing a watchman while such work was being done, not being provided for in the original contract, could not be charged against the defaulting contractor.

7. CONTRACTS—BUILDING CONTRACT—LIQUIDATED DAMAGES.—Where a certain sum per day was named in a building contract as liquidated damages for delay in completing the building after a named date, and the contractor threw up the job, and it was subsequently let to another contractor on a different basis, the defaulting contractor was liable for such liquidated damages from the time the contractor unlawfully refused to complete the work until the district took over the work.

Appeal from Mississippi Chancery Court, Chickasawba District; *Archer Wheatley*, Chancellor; modified and affirmed.

*L. C. Going*, for appellant Hollingsworth.

The school district contracted with Mitchell Selligman as architect alone, not with Selligman & Edelsvard. See contract of March 20, 1919. Article 2 thereof recites: "It is understood and agreed by and between the parties hereto that the work included in this contract is to be done under the direction of the said architect (meaning Selligman), and that his decision as to the construction and meaning of the drawings and specifications shall be final." That bound both parties. 88 Ark. 213; 112 Ark. 83. There has been a substantial compliance with the contract, and that entitled Hollingsworth to his pay. 97 Ark. 278; 64 Ark. 34; 105 Ark. 353; 122 Ark. 308; 131 Ark. 481.

*Edward B. Klewer*, for appellant Maryland Casualty Company; *Ashley Cockrill*, of counsel.

1. There was a substantial compliance with the contract. 97 Ark. 278, 133 S. W. 1032. The architect, Selligman, was of the opinion that there had been a sub-

stantial performance of the contract. His decision cannot be questioned, except for fraud, or gross mistake, necessarily implying bad faith or failure to exercise an honest judgment. 48 Ark. 522, 3 S. W. 639.

2. There was no certificate by the architect of such refusal, neglect or failure on the part of the contractor as to justify the owner in terminating the employment of the contractor, and taking over and completing the building, Mitchell Selligman being the architect authorized by the contract to make such certificate. Such certificates are conditions precedent to the right of the contractor to furnish labor and material, or the right to terminate the employment of the contractor; and such a provision in a building contract is in the nature of a forfeiture which should be strictly construed, it being incumbent on the owner to show a strict compliance with the contract, or a valid excuse for noncompliance. 77 Ark. 305, 90 S. W. 1000; 142 Ark. 539, 219 S. W. 328; 100 Ark. 565, 568; 87 Conn. 41, 86 Atl. 755; 127 Fed. 671, 62 C. C. A. 397; 80 Conn. 134, 67 Atl. 369, 13 L. R. A. (N. S.) 448; 56 Minn. 410, 57 N. W. 943. Even if Edelsvard was an ''architect'' within the meaning of the contract, a joint certificate by both was necessary before the owner would be justified in terminating the contractor's employment. 30 Ind. App. 342, 65 N. E. 1061; 173 Ill. 179, 50 N. E. 716; 165 Cal. 497, 133 Pac. 280, Ann. Cases, 1916-C, 44; 193 Mo. App. 132, 182 S. W. 143. See also 144 N. Y. 691, 39 N. E. 394; 157 N. Y. Supp. 782; 21 Ga. App. 758, 95 S. E. 113.

3. If Edelsvard, associate architect, was authorized by the contract to give such certificate, the purported certificate given by him was insufficient in law to comply with the contract, article 5. 157 N. Y. Supp. 782; 70 N. J. L. 4, 56 Atl. 304; 68 N. J. L. 627, 54 Atl. 815; 104 Fed. 930; 144 N. Y. 691, 39 N. E. 394: 193 Mo. App. 132, 182 S. W. 143; 95 S. E. 113; 105 Atl. 467.

4. The three days' notice prescribed by article 5 of the contract to be given to the contractor by the owner

after the making of such certificate by the architect was not given to the contractor. 193 Mo. App. 150; 213 S. W. 151; 165 Cal. 497; 213 S. W. 151.

5. The decision of the architect as to compliance was final, and could be impeached only by clear and convincing proof of fraud, or mistake so gross as to imply bad faith or the exercise of dishonest judgment, and the evidence does not justify such finding. 70 Ill. App. 273; 84 Ill. 225; 158 Ill. 432; 90 N. Y. Supp. 115, 44 Misc., 555; 165 Pa. St. 394, 30 Atl. 988; 37 Ark. 145; 38 Ark. 419; 92 Ark. 509, 122 S. W. 649; 112 Ark. 83, 164 S. W. 1137; 88 Ark. 213, 114 S. W. 242; 83 Ark. 136, 103 S. W. 620; 79 Ark. 506, 96 S. W. 70; 68 Ark. 185, 56 S. W. 1068; 48 Ark. 522, 3 S. W. 639.

6. As to liquidated damages for delay in completion, there was no notice of default, and the surety was therefore relieved of its obligation to pay such damages.

7. The school district waived strict compliance with the terms of the contract requiring completion within five months of its execution. 99 Ark. 340, 138 S. W. 467; 104 Ark. 9; 103 Ark. 484, 145 S. W. 234; Wait, Engineering & Architectural Jurisprudence, § 325; 9 N. Y. Supp. 538; 121 Ill. 571; 120 N. Y. 236; 1 N. Y. Supp. 500; 81 N. J. Eq. 286, 86 Atl. 958; 20 L. R. A. (N. S.) 350, notes; 2 L. R. A. 1916-E, 1180, notes.

8. The burden was on cross-complainant to legally prove its damages, and there is no legal proof of any damage sustained by it. 44 Ark. 439; 153 Ill. App. 43; 10 Ore. 440.

9. The provision of the contract with respect to the certificate of the architect, that he has audited the cost of completion, should be strictly construed.

*R. A. Nelson,* for appellee.

1. It being a question of fact as to whether or not there was a substantial performance of the contract by the contractor, the trial court's finding that there was not a substantial performance will not be reversed, if

supported by the evidence, 148 Ark. 296; 129 Ark. 583; 130 Ark. 178; 6 Cyc. 54, 57, 58.   97 Ark. 282; 79 Ark. 115; 102 Ark. 53.

2.   Propositions 2, 3 and 4 urged by the casualty company go only to the sufficiency of the notice to comply served upon the contractor, and of the architect's certificates, to warrant the owner in taking over the building, under article 3 of the construction contract, upon default of the contractor.   These alleged defenses were not pleaded in the trial court and cannot be raised here.   37 Ark. 542; 91 Ark. 30; 129 Ark. 280.

If these matters were conditions precedent, and therefore defenses to the appellee's action against the contractor and his surety, they were material defenses, and should have been pleaded in the lower court.   C. & M. Digest, § 1231; 85 Ark. 567; 128 Ark. 240.

3.   As to proposition 5, it is not correctly stated in the form submitted to the trial court; but court's finding that Selligman's conduct was such as to amount to bad faith was in accordance with the proof.

4.   As to liquidated damages and appellant's argument thereon, reference is had to the surety company's bond, viz: "Provided, that any alterations which may be made in the terms of the contract or in the work to be done under it, or the giving by the owner of any extension of time for the completion of the contract, or any forbearance on the part of the owner, shall not in any way release the principal and surety, or either of them, * * * from liability herein assumed, *notice to the surety of any such alterations, extensions or forbearances being hereby waived.*"   4 R. C. L., 3547; 29 Cyc. 1117; 32 Cyc. 106, 107; 92 Ark. 519.

5.   The above waiver carries with it appellant's proposition 7.   Moreover there is no plea or proof that the school district ever received any consideration for the so-called waiver of completion on time.   4 R. C. L. 3719; 9 C. J. 794.

6.   The method adopted in the audit or certificate of the architect was that agreed upon by the parties under

article 5 of the contract, and the amount of the certificate was never questioned for fraud or mistake in the trial court, and all parties are bound by it. 6 Cyc. 40, 42; 48 Ark. 522; 68 Ark. 187; 79 Ark. 513; 83 Ark. 402; 88 Ark. 224; 91 Ark. 421.

SMITH, J. On March 11, 1920, J. E. Hollingsworth, a building contractor doing business as J. E. Hollingsworth & Co., sued the Leachville Special School District, alleging that on or about May 20, 1919, he and the said district entered into a written contract, whereby he agreed to erect and complete a certain brick school building in the town of Leachville, according to the plans and specifications made a part of the complaint, for the sum of $34,000. That he began the construction of the building under his contract, and had expended thereon the sum of $20,178.80, and that he had been paid by the school district, on the certificate of the architect, the sum of $12,800, leaving a balance due him of $7,378.80. That on or about December 10, 1919, the school district forcibly took possession of said partly constructed building, and refused and declined to permit him to complete same, and that such action on the part of the school district was unlawful and wrongful, in that he was constructing the building in accordance with the plans and specifications.

On March 27, 1920, the school district filed its answer and cross-complaint. It admitted the execution of the contract sued on, but denied that the building was constructed according to the plans and specifications, and denied that it had, without right, forbidden plaintiff to continue the work, and averred that its reason for not permitting plaintiff to continue was that he had refused to construct and complete the building in accordance with the plans and specifications.

In its cross-complaint the school district set up the contract, and alleged the execution of a bond for its faithful performance by the Maryland Casualty Company as surety. The plaintiff, the surety and Mitchell Sellig-

man, the architect, were made parties to the suit.    It was alleged that the architect had conspired with the plaintiff to obtain the contract for the plaintiff, and that the architect had fraudulently permitted the plaintiff to make substitutions of defective material, and had fraudulently approved defective work by the contractor.

Answers were filed by the cross-defendants, denying all the allegations of the cross-complaint, and alleging that the work of the contractor was in accordance with the plans and specifications, and had been accepted and approved by the architect, whose decision, according to the terms of the building contract, was final with respect to the work, and averred failure to give notice of default.

The final decree dismissed the complaint, and also the cross-complaint in so far as the architect was concerned, but gave the district a judgment against Hollingsworth and his surety, and this appeal is from that decree.

The record is very voluminous, consisting of over a thousand pages, and the briefs, which are correspondingly large, discuss at length the conflicting testimony of the numerous witnesses.    We shall not undertake to review all this testimony, although we have considered it, and have reached the conclusion that the findings of fact upon which the decree of the court below was based were not clearly against the preponderance of the testimony except as to two items, which we think were improperly charged against the contractor.

For the reversal of the judgment it is insisted:

1.    That there was a substantial performance of the contract on the part of the contractor up to the time of his discharge; and this is the principal question in the case.

2.    That there was no certificate by the architect of a failure on the part of the contractor to comply with the contract, it being insisted that Selligman was the architect authorized by the contract to make that certificate.

3.    That, if the associate architect, who made the certificate upon which the directors acted in discharging

the contractor, was authorized to so certify, he should have done so in connection with Selligman, and not individually as he did do.

4.  That proper notice, as prescribed by the contract, was not given by the district to the contractor of his discharge.

5.  That the decision of the architect as to compliance with the contract was final, and could be impeached only by proof of fraud or mistake so gross as to imply bad faith and the exercise of dishonest judgment, and the evidence does not justify that finding.

6.  That there was no notice of default, and the surety was, on that account, relieved of its obligation to pay liquidated damages for delay.

7.  That the district waived strict compliance with the terms of the contract requiring the completion of the building within five months.

8 and 9.  That the district did not properly prove the damages allowed it.

The propositions stated are substantially questions of fact, as the principles of law which control their decision are well settled and are not in dispute between the parties, and we will not undertake a separate discussion of each of these propositions.

There are provisions in the building contract which make the architect the final arbiter between the contractor and the district, and it becomes important, therefore, to determine who the architect was, as Hollingsworth took the position, when the first disagreement arose, that Edelsvard was not the architect, and Hollingsworth demanded that Selligman approve the findings and directions of Edelsvard before he would assent thereto. On that question we quote from the contract as follows: "This agreement, made this 20th day of March, 1919, by and between the Leachville Special School District, party of the first part, hereinafter called the owner, and Mitchell Selligman, party of the second part, hereinafter called the architect, with G. A. Edels-

vard, associate, witnesseth:'' The same instrument defines the terms, ''owner,'' ''architect,'' and ''contractor,'' the definition of ''architect'' being ''the term 'architect' refers to Mitchell Selligman or associate.''

Selligman and Edelsvard were partners, as Selligman & Edelsvard, at the time the district contracted with them as architects, although the negotiations leading to their employment were conducted by Selligman, and that member of the firm acted for the firm in the award of the contract to Hollingsworth, the plaintiff in this suit. However, the plans and specifications were prepared by Edelsvard.

The court below was of the opinion that Edelsvard, as well as Selligman, was the ''architect,'' as that term was used in the contract, and we concur in that finding.

The contract specified what supervision the architect should give the building and what his duties should be in that connection, and we think it was contemplated by the parties that either Selligman or Edelsvard might perform those duties. The contractor was therefore in error in disputing Edelsvard's authority as architect.

Four bids were received by the district for the construction of the building as originally advertised. The lowest bid was $34,737, and was made by H. E. Monk; the next lowest bid was $34,887, and this bid was made by the plaintiff Hollingsworth. The district had only $34,000 to spend for the building, and did not accept any of these bids. Selligman undertook to revise these plans by reducing the cost of the building by $887, and after doing so Hollingsworth's bid was accepted.

The alterations thus made were indicated on the plans as ''Addenda A,'' and much stress is laid on these alterations by the district as tending to show collusion between Selligman and Hollingsworth. Monk testified that the alterations made by Selligman did not reduce the building cost only $887, but that the amount of the reduction was $2,134, and he testified that, if he had been given an opportunity to revise his bid after the

alterations had been made, he could, and would, have reduced his own bid by that amount, whereas Hollingsworth reduced his bid only to the extent of $887.

There was testimony on the part of the district that Selligman refused to give Monk an opportunity to revise his bid on the ground that Monk probably could not make the required bond, the intimation being, of course, that Monk was not a responsible bidder. The insistence of the district, in this connection, is that Selligman and Monk were unfriendly, and that the relations between Selligman and Hollingsworth were unduly friendly. Selligman denied that this was true, and he denied that the alterations in the plans which he made warranted a difference of more than the $887 reduction necessary to bring Hollingsworth's bid within the money the district could pay, and he testified that he was not asked by the directors of the district to figure with any other bidder on any reduction of the amount bid.

The first issue between Selligman and Edelsvard came over the allowance of an estimate which Hollingsworth asked the district to pay. Edelsvard testified that he told Selligman the sum demanded was in excess of the amount then payable under the contract, and Selligman admitted this was true, but insisted that the estimate be approved notwithstanding that fact, but Edelsvard refuse to do so. Selligman denied this. An issue also arose between Selligman and Edelsvard over the approval of the work covered by this estimate. Edelsvard went to Leachville and condemned a lot of the work, and, among other things, ordered brick walls torn down. Hollingsworth declined to obey Edelsvard's direction, and insisted that his work was not defective, and had been approved by Selligman. In this connection there were introduced certain telegrams and correspondence, which, it is strongly insisted, show Selligman's entire good faith. Edelsvard wired Selligman that Hollingsworth had disputed his authority and claimed to have his (Selligman's) approval of the work. Selligman an-

swered by wire affirming Edelsvard's authority, and denying that he had given a blanket approval of Hollings-worth's work. The issue between Edelsvard and Hollingsworth remained unsettled, and Selligman himself went to Leachville. Upon Selligman's return home he wrote a letter to the school directors, in which he expressed the opinion that Hollingsworth was correct in his contention. In the same letter Selligman insisted, first, that the alleged defective work was not so defective that it could not be remedied, and, in his testimony, explained the remedy he would have applied. He also stated in the letter that such defects as did exist resulted from defects in the plans, and not from faulty materials or work. Edelsvard insisted to the contrary, and the directors accepted his view as correct. There was a meeting at which all parties in interest were present or were represented, and the directors announced their approval of Edelsvard's position, and called upon the representative of the surety company to comply with Edelsvard's directions and complete the building after Hollingsworth had declined to do so.

It was insisted at that meeting, as Hollingsworth had all along insisted, that the trouble was with the plans, and there is much testimony in the record which supports that contention. In fact, if the case was disposed of on the testimony of the witnesses who qualified as experts, and testified as such, it must be confessed that the clear preponderance of the testimony shows that the plans were defective, and the troubles complained of by Edelsvard were attributable to the defect in the plans.

The testimony of these experts appears to be overcome, however, by the undisputed fact that the defective work was torn away and the building was completed according to the plans which the experts had testified were defective, and there is no disagreement that the district has a satisfactory building.

The principal defect complained of in the plans was that the weight of the building had not been properly

distributed over the foundation, and the explanation is offered that it became possible to erect a good building under the plans used only because the foundation had properly settled. Of this we shall have more to say.

It is conceded that there were numerous departures from the plans. It is said, however, that most of these were unimportant and immaterial, and resulted chiefly from the inability of Hollingsworth to obtain the articles called for in the specifications, resulting from the congestion of railroad traffic existing at the time, and the inability to have builder's orders promptly filled. It is also insisted that such variations as might be deemed material did not impair the value of the building, and were authorized by Selligman in good faith.

It is undisputed that many defects existed at the time Selligman and Edelsvard disagreed, and, as has been said, the chief issue of fact was the cause of these defects—whether defective plans, or defective work—and it is undisputed that one of the brick walls fell, and the remaining walls were torn down. One of the orders which Edelsvard had given, and which Hollingsworth refused to obey, was to tear down these walls. Hollingsworth accounts for the falling of the wall by saying that the building had been left unoccupied from October 20, 1919, to January 5 thereafter; but the court did not accept this explanation, and neither do we. The walls were shown to have been out of plumb, some of the witnesses placing the variation in this respect as high as four inches; and the testimony shows an insufficient quantity of cement was used, and that the mortar was not properly mixed. A number of witnesses testified that brick could be, and were, pulled out of the walls like pulling books out of a book-case. The other defect in the walls was that the walls had cracked. There was no dispute about that fact, although there was the sharpest conflict as to the extent and cause and probable effect of these cracks.

It was insisted by Selligman that these cracks were not as serious as Edelsvard claimed, and could have been

closed by certain excavations of the foundation; and the witnesses who testified in Hollingsworth's behalf as experts expressed the same opinion. One of these witnesses, in response to a hypothetical question which assumed as existing the conditions which Edelsvard and the other witnesses for the district had testified did exist, admitted that, under the facts assumed, the building should have been torn down, and nothing else could have been done to make the building safe.

We do not concur in the view that there was any trouble with the foundation. The building was located on "confined" sand, and the testimony is all to the effect that only solid rock makes a better foundation—the coarser the sand the better the foundation.

Building operations entirely ceased on October 20, 1919, this being the date when the contractor and the representative of the surety company definitely refused to take down and reconstruct the building; and building operations were not resumed until January 5, thereafter. During this time there may have been, and probably was, some additional settling of the concrete foundation on which the walls were erected; but we do not think this settling made it possible to build a good building, whereas before it had been impossible to do, and such was not the theory of the experts, their chief objection to the plans being that the weight of the building had not been properly distributed over the foundation.

Upon the first submission of the cause the court prepared a written opinion in which he announced certain conclusions which he had reached. Among other findings of the court was one to the effect that Hollingsworth and his surety did not have the right to rely on the decisions of Selligman, for two reasons. The first was that Selligman had given up the work before the time for the more important decisions; and the second reason was that his inattention to the work amounted to bad faith, though there was no satisfactory proof of fraud. Selligman's contract with the district provided for personal attention on the job at least once every two weeks, but, despite re-

peated calls when the board of directors were complaining of defective work, he made only three visits in five months.

The court found as a matter of law that "a substantial compliance by the contractor is all that is required under the law, he being charged (where there is a substantial compliance) with the difference in value between the work as done and as contracted to be done, or the replacement of defective work where this can be done, or the replacement of defective work where this can be done without great expense or material injury to the structure as a whole."

We approve both the finding of fact stated and this declaration of law.

The court, after making certain general findings of fact, propounded the following question: "The question for decision therefore is: Could the defective masonry have been replaced with reasonable expense without tearing down the whole structure? If it could, then the district is entitled to charge only what such cost would have been, together with difference in value of brick, steel, lugs, caps, bases, etc., furnished and those contracted for. On the other hand, if the inferior masonry was all over the building so that the structure was unsafe (and the maximum of safety is required for school buildings where hundreds of little children are housed) and it was necessary to rebuild in order to be certain of durability, then the district was justified in dismantling the house as a whole and in the rebuilding to use materials conforming strictly to the contract."

The court then directed that additional testimony be taken for the purpose of enabling him to determine the questions stated, and what damages should be awarded the district if it was found the structure had to be torn down; and the additional testimony was taken, and the court thereafter rendered a final decree assessing as damages the cost of tearing down and removing defective work and rebuilding in accordance with the original plans.

We will not set this testimony out in detail. There is much conflict in it, and much of it cannot be reconciled. As we have said, the preponderance of the expert testimony supports the contention of Hollingsworth, but the decided preponderance of the practical testimony—that of the men who tore down the old work and replaced it—supports the finding of the court below. We are largely controlled by the fact that a satisfactory building has been erected according to the plans and specifications which the expert witnesses condemned.

After Hollingsworth was discharged, Monk was employed to complete the building, and was paid for this service on the basis of cost plus ten per cent. He testified that in tearing down and removing the condemned parts of the building he discovered that much material of a cheaper kind than that called for by the specifications had gone into the building, and he estimated this difference amounted to $2,336. Complaint is made of the commission paid Monk; but it does not appear that the work could have been contracted on more advantageous terms at that time. Monk testified that a wall fell before he took the job, and he did not know what conditions he would find.

Edelsvard furnished the district a certificate that the total cost to the district for the construction of the building was $64,400.59, and that there were credits against this amount of $34,722.63, leaving a balance above the original contract price of $28,677.96, and that the building remained uncompleted for 400 days after October 20, 1919, the date of the expiration of the five months' limit allowed for the construction of the building, and that the liquidated damages for that period at $25 per day, the sum specified in the contract, amounted to $10,000.

The original contract gave the architect the right to make such a certificate against the contractor; but we think no binding effect can be given to the certificate of Edelsvard for the reason that Monk's work was not done

under the contract. Edelsvard's certificate and his testimony in regard thereto are competent as evidence of the facts recited, but they are not conclusive, and we do not approve the figures made by him in their entirety for the reasons hereinafter stated.

Objection is made to the fee paid Edelsvard. This fee was not paid Edelsvard under the old contract, but was his compensation for services in connection with the tearing down and rebuilding of the schoolhouse, and the testimony showed the sum paid him was a necessary expense under the circumstances.

It is said certain errors in addition appear in Edelsvard's figures amounting to $363.30, and no explanation of what appears to be an erroneous addition is made, and this error must, of course, be corrected.

It is insisted that Monk used a more expensive brick than Hollingsworth was required to use, and an additional cost of $572 was incurred on that account. The testimony does not appear, however, to support the charge that a more expensive brick was used than the original contract called for. Certain other disputed items may be disposed of similarly.

The court allowed an item of $525 covering the expense of a watchman during the reconstruction of the building. Such an expense does not appear to have been provided for in the original contract, and we think no authority was shown for making this charge against the contractor and his surety.

The court refused to allow the liquidated damages certified by Edelsvard, but did allow liquidated damages from the time Hollingsworth refused to proceed until the directors commenced work on the building. In other words, the court took no account of the period of time in excess of the five months amounting to 400 days, but did charge Hollingsworth for the time covered by his refusal to proceed before the district took over the work. We think this was not unfair to Hollingsworth, and the surety company was advised of the issue between the par-

ties and refused to complete the building, as it had the right to do, and it is chargeable therefore with liability for the liquidated damages assessed as a part of its obligation as a surety.

The decree will be modified by reducing it to the extent of the error in addition, and the charge for the services of the watchman, and, as thus modified, will be affirmed.