HARRIS *v.* HOLDER.

4-9155                                      230 S. W. 2d 645

Opinion delivered June 5, 1950.

Rehearing denied July 3, 1950.

*Surrey E. Gilliam,* for appellant.

*Arwin & Stein* and *Mahony & Yocum,* for appellee.

MINOR W. MILLWEE, Justice.   Appellee, W. M. Holder, is a building contractor and appellants, John W. Harris, W. Bradley Trimble, and W. B. Justiss, are partners doing business as Justiss Motor Company.   On

May 12, 1948, appellee contracted to construct a Quonset steel garage building for appellants in El Dorado, Arkansas. El Dorado Lumber Co. sold appellants the steel to be used in construction of the building. Appellee was to furnish the labor, certain materials and construct the building for $4,446.

The Justiss Motor Co. moved into the building the latter part of July, 1948. On September 17, 1948, appellee filed this suit alleging due performance of the contract, the payment by appellants of only $1,500 of the contract price, and prayed judgment for the balance together with damages to his reputation and credit.

Appellants' answer and cross-complaint denied that the building was completed according to the contract and particularly alleged breach of the contract in construction of the concrete floor which was alleged to be defective and unusable for the purposes intended. Appellants prayed damages on the cross-complaint against appellee and the surety on the performance and labor and material payment bonds executed by appellee.

A suit previously filed against appellee by certain materialmen was consolidated with the instant suit and judgments sustaining liens in favor of said materialmen were entered under a stipulation of all the parties.

After an extensive hearing the trial court found that the concrete floor was defective, but that such condition resulted from appellants' interference with appellee in the manner and method of doing the work. A decree was entered in favor of appellee for the balance found due under the contract after discharge of the judgments entered in favor of the materialmen. Appellants' cross-complaint was dismissed for want of equity and they have appealed.

In reference to the construction of the 6,000-foot floor the contract provides that appellee shall furnish: "All materials and labor for 6" floor of 2,000 lbs. concrete, reinforced with 6" x 6" x 10-gauge steel in slabs 20 ft. x 20 ft., reinforcing mesh to be broken at all expansion joints and joints cleaned and filled with either mastic

or formed expansion strips; all slabs to be floated and finished in a workmanlike manner and all details to be strictly adhered to." While a great deal of testimony was directed to the condition of the concrete floor, it is undisputed that it was defective and not finished in a workmanlike manner as required by the contract. Expert and lay witnesses on both sides testified that the floor was rough, uneven, or out of level in many places, and that the topping was soft, pitted, flaky and crumbly.

In his testimony appellee first denied but later admitted that the floor was defective and offered a variety of reasons therefor. He stated that the building site was moved back 50 feet from the original level location called for in the contract to a place where there was a three-foot fill which he was required to "cat-pack." The written contract recites that the building was to be located at 1200 West Hillsboro Street, but does not otherwise designate the building site. Appellee apparently acquiesced in the change of building sites, if made, and the preponderance of the evidence fails to disclose that the defective condition of the floor resulted from such change.

The contract also provided for erection of the building "according to blueprints furnished by El Dorado Lumber Co. subject to changes as directed by engineer approved by El Dorado Lumber Company." Edward Bader was sent to El Dorado by the manufacturer of the steel furnished by El Dorado Lumber Co. and was employed by the latter as the engineer designated in the contract. The evidence on behalf of appellants is that they knew nothing about concrete construction and made no attempt to supervise appellee or his employees in the construction of the concrete floor. Appellee stated that both Bader and Justiss supervised the laying of the floor and that Harris and Bader directed appellee to pour concrete on ground that was too soft and wet.

The preponderance of the evidence was to the effect that it is not an improper practice to pour concrete on wet ground in hot weather, but that the use of too much water might cause the concrete slab to crack or sink.

According to the greater weight of the evidence the slab base of the floor in controversy did not crack or sink and the defects in the floor resulted from the manner in which the topping or surface was laid and finished.

There was evidence that the soft and flaky condition of the topping was caused by allowing it to dry while unprotected and uncovered from the hot sun. Appellee stated that such condition might have been caused by leaving the floor uncovered, but asserted that appellants failed to furnish material for that purpose. Appellants were not required to furnish such covering either under the contract or local custom. Several contractors testified that dirt, which was available to appellee, furnished the best covering and was used generally by them for that purpose.

Another reason assigned by appellee for the defective condition of the floor was that appellants and Bader ordered delivery of the mixed concrete too rapidly and before appellee was ready for it to be poured. The mixed concrete was purchased by appellee from Gilliam Bros. Appellants' denial that they ordered the concrete is corroborated by the representative who handled the orders for Gilliam Bros. He testified that appellee ordered the concrete sent out and all the delivery tickets were shown to have been signed by appellee. While appellee stated that he told the truck drivers to slow down the delivery, there is no showing that he made any complaint to the representative who handled the orders.

Appellee also claimed that appellant Justiss interfered by allowing water to run all night on the fresh concrete floor. His testimony on this point is somewhat contradictory. Although he testified that he directed Justiss to sprinkle the concrete at night, he stated that it constituted a bad practice when the floor was unprotected from the sun. He also testified that Justiss continued to run too much water on the floor after being warned not to do so, but this was stoutly denied by appellants' witnesses.

Appellee and his employees stated generally that Bader supervised and directed the construction of the

floor but they were unable to name specific orders which contributed to the defective conditions found. Bader directed the use of extra steel in the curb walls and larger expansion joints in the floor, but neither of these changes had anything to do with the defects in the floor and appellee apparently concurred in the changes which were authorized under the contract.

The contract stipulated that the 20' x 20' slabs should be "floated and finished in a workmanlike manner." According to the evidence there are two types of finish—a "wood float" finish and a "steel trowel" finish. Either finish will produce a smooth surface, but a steel trowel finish produces a harder surface and requires more time. Ed Moore, the only finisher on the job, testified that he was putting a wood float finish on one of the first slabs when Justiss told him he didn't like it and wanted it steel finished; that appellee refused to agree to a steel finish, but witness disregarded the wishes of his employer and followed the instructions of Justiss; and that a bad finish resulted because they were laying too much concrete per day. Bader corroborated Moore as to the direction by Justiss that a steel trowel be used, but stated that appellee ordered Moore to use the steel trowel in compliance with the suggestion of Justiss. Although appellee stated that he told Justiss he would not pay Moore for a "slick finish," he admitted that he told Moore to do what Justiss requested in connection with the finishing of the floor. It thus appears that appellee acquiesced in the method of finishing suggested by Justiss.

It is undisputed that Moore was a good finisher, but the greater weight of the evidence discloses that he was trying to finish more concrete (1,200 feet) per day than could be done in a workmanlike manner regardless of the type of finish used. Pat Riley, an experienced contractor and witness for appellee, examined the floor and, after listening to the testimony of Moore, testified: "Q. What was the trouble out there? A. I think it was too much work for one finisher."

W. M. Bearden, another contractor, testified on behalf of appellee as follows: "Q. How many feet can a

man trowel in a day? A. 500 feet, and that is all he can. Q. How many feet can a man float finish with wood? A. A thousand feet. Q. Did you hear some witness testify that they were trying to float 1,200 feet? A. Then they got what they have out there. It is pretty expensive to try to do it that way. It can't be done. . . ." Other contractors stated that one finisher could only finish from 300 to 750 feet per day, particularly in hot weather. Bader testified that appellee repeatedly stated that he was going to employ more finishers.

It is elementary that there is no breach of a contract where performance is prevented, or rendered impossible, by the conduct of the other party. *Townes* v. *Oklahoma Mill Co.*, 85 Ark. 596, 109 S. W. 548. It is also generally recognized that a defective performance of a building contract is excused where it is due to the acts of the owner or his representative, unless the contractor has not offered a substantial compliance with the contract. 17 C. J. S., Contracts, § 46 (a). See, also, 9 Am. Jur., Building and Construction Contracts, § 45.

We conclude that the preponderance of the evidence does not show that the defective condition of the floor was occasioned by interference on the part of the appellants, but was primarily due to the failure of appellee to furnish a sufficient number of finishers and to properly cover and protect the freshly laid floor from the sun. The greater weight of the testimony also warrants the conclusion that appellee acquiesced in any changes and suggestions made by appellants and Bader in the construction of the floor.

There was considerable conflict in the testimony as to whether appellants accepted the work of appellee when they moved into the building, but a determination of this question is immaterial under the rule which this court has adopted. In *Fitzgerald* v. *La Porte*, 64 Ark. 34, 40 S. W. 261, it was held: "Where work has been done substantially in compliance with the terms of a contract, or there has been an acceptance of the work by the contractee, the contractor may, notwithstanding defects therein, recover

the contract price, less the cost of correcting such defects.''

In *Roseburr* v. *McDaniel,* 147 Ark. 203, 227 S. W. 397, the court said: ''The rule established by decisions of this court is that where a building contract is substantially performed, even though there are omissions and deviations therefrom, if such defects do not impair the structure as a whole and are remediable 'without doing material damage to other parts of the building in tearing down and reconstructing, and may without injustice be compensated by deductions from the contract price,' there may be a recovery for the amount found due after making such deductions.''

In *Hollingsworth* v. *Leachville Special School District,* 157 Ark. 430, 249 S. W. 24, we held that where defects are remediable without taking down and reconstructing any substantial portion of the building, the amount of deduction from the contract price to which the owner is entitled is the expense of making the work conform to contract requirements. This is in accord with the general rule stated in 9 Am. Jur., Building and Construction Contracts, §§ 43 and 152.

There is considerable variance in the testimony as to the expense necessary to correct the defects in the floor. The evidence is also conflicting as to the number of slabs that were defective. Two contractors submitted bids to appellants in the amounts of $2,580 and $2,500, respectively, for placing a four-inch concrete floor on top of the present floor. They considered this the appropriate way to correct the defects. These bids were based on the use of ''3,000 lbs.'' concrete and a steel trowel finish. Another contractor who testified on behalf of appellants gave an estimate of $2,750 for a four-inch floor. He stated that a three-inch layer of concrete could be used with a patented ''ceiling,'' but he did not figure the cost of the three-inch floor. One witness experienced in concrete work stated that a four-inch top floor would cost $1,300 excluding overhead and profit. He thought a two-inch top might suffice after use of an air hammer

on the old floor. Another contractor stated that it would take $1,800 or $1,900 to remedy the floor while appellee stated that it could be done at a cost of $500. There was other evidence that a 3-inch top floor would be sufficient.

We hold that appellants are entitled to damages for appellee's failure to properly construct the concrete floor in the sum of $1,500 which amount, together with the amount of judgments in favor of the materialmen, appellants are entitled to offset against the balance due on the contract price. Appellants are also entitled to judgment against appellee and the surety on his performance and material and labor payment bonds for any excess due after proper credit is allowed for the balance due on the contract price. The decree is, therefore, reversed and the cause remanded with directions to enter a decree in accordance with this opinion.