LANDMARK MEDICAL CENTER

v.

Claire M. GAUTHIER et al.

No. 93–61–Appeal.

Supreme Court of Rhode Island.

Jan. 6, 1994.

Paul A. Brule, Central Falls, for plaintiff.

Francis Gaschen, Pawtucket, for defendants.

## OPINION

SHEA, Justice.

This matter came before the Supreme Court pursuant to G.L.1956 (1985 Reenactment) § 9–24–25 and Rules 72 and 76 of the Superior Court Rules of Civil Procedure. The Superior Court accepted an agreed statement of facts and certified three questions for our consideration. We summarize the pertinent facts.

The defendant Claire M. Gauthier (Claire) and her late husband, Louis J. Gauthier (Louis), both incurred medical expenses at plaintiff, Landmark Medical Center (Landmark). Landmark, the successor to Woonsocket Hospital, is a Rhode Island corporation providing hospital services in Woonsocket, Rhode Island. Claire is a resident of Woonsocket and the mother of defendants Gisele T. Gauthier (Gisele) and Suzanne B. Hooven (Suzanne). Louis was also a resident of Woonsocket and the father of Gisele and Suzanne.

Prior to his death Louis incurred medical expenses between March 1988 and December 1988 totaling $58,510.39 at Landmark. Claire also incurred medical expenses at Landmark between December 1988 and January 1989 totaling $11,974.75. Both parties agree that the charges billed for the medical services provided to Louis and Claire were fair and reasonable.

Louis died on December 24, 1988. Since none of his assets were subject to probate, no probate estate was ever opened. The principal asset that he owned at the time of his death was a three-unit apartment house located on Maple Street in Woonsocket. He owned that property as a joint tenant with Claire. By operation of joint tenancy, the property passed directly to Claire at the time of his death. After Louis's death, Claire continued to reside on the first floor, as she and her husband had prior to his death.

Landmark filed suit solely against Claire for payment due for the medical expenses rendered to both her and her late husband. A default judgment was obtained, and an execution issued against the real estate. The default judgment was vacated, and the execution was recalled after a showing that some-

time during the twenty-day period after service of the complaint, Claire had been admitted to the Institute of Mental Health (IMH) in Cranston, Rhode Island.

Immediately after the judgment was vacated and the execution was recalled, Claire deeded the apartment house, which was her principal asset, to her two daughters, Gisele and Suzanne, for no consideration, while retaining a life estate for herself in the property. She did not give notice to Landmark of the execution or recording of the deed when she transferred her interest.

Landmark then initiated a second suit against Claire and her daughters, alleging a fraudulent conveyance. The suits were consolidated, and the complaint was amended to raise additional allegations. Landmark now alleged that not only was Claire liable for the medical expenses of Louis by virtue of their marriage, but Suzanne and Gisele were also liable to Landmark for the medical expenses of both their parents by virtue of G.L.1956 (1988 Reenactment) chapter 10 of title 15. The defendants denied liability to Landmark, and the following questions were certified for this court's consideration:

"I. What is the liability of the defendant, Claire M. Gauthier, for the above listed medical expenses of herself?

"II. What is the liability of the defendant, Claire M. Gauthier, for the above listed medical expenses of her husband?

"III. What is the liability of the defendants, Suzanne B. Hooven and Gisele T. Gauthier, for the above listed medical expenses of their mother and father?"

Before answering these three questions, we are compelled to address an underlying fourth issue regarding the validity of Claire's conveyance of the apartment house to Gisele and Suzanne. Landmark argues that Claire's conveyance of the apartment house to her daughters was done with the intent to hinder, delay, or defraud her creditor and was therefore fraudulent and void. We agree.

Claire conveyed her interest in the property to her daughters, subject to her life estate, immediately after the judgment against her was vacated and the execution on that property was recalled. The transfer was not made for any taxable consideration, and on the deed was the notation that "consideration is such that no documentary stamps are required." General Laws 1956 (1992 Reenactment) § 6–16–4 provides in pertinent part that

"(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) Was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debt beyond his or her ability to pay as they became due.

"(b) In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made * * * the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all of the debtor's assets * * *."

■ An examination of Claire's conveyance in light of the factors in § 6–16–4(b) indicates that it was indeed fraudulent. The transfer was made to her daughters for no taxable consideration while she retained a life estate. The transfer was concealed in that no notice was given to her existing creditor, Landmark, who had already commenced suit

against her. The apartment house was also Claire's principal asset. A clear inference of fraudulent intent can be drawn from a review of the agreed facts submitted under the considerations outlined in the statute.

In addition, § 6–16–5(a) establishes that "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time, or the debtor became insolvent as a result of the transfer or obligation."

We have previously stated that "the mere establishment by a plaintiff that a conveyance was made by an insolvent debtor without consideration [does not] give rise to a presumption that it was fraudulent." *Ducharme v. Champagne*, 110 R.I. 270, 274–75, 292 A.2d 224, 226 (1972). However, the absence of proof of actual fraud is not fatal to plaintiff's claim. *Id.* "As has often been said, a debtor must be just before he is generous." *Tanner v. Whitney*, 52 R.I. 391, 394, 161 A. 122, 123 (1932).

We have long held that a prima facie case of intent to delay, hinder, or defraud creditors is established when a conveyance of all a person's property is made to a spouse for nominal consideration and after a notice of a claim against that person. *Savoie v. Pion*, 52 R.I. 422, 424, 161 A. 219, 220 (1932). The same finding would result from a conveyance between such close family members as a mother and her daughters as opposed to dealings between strangers.

We also find it interesting to note plaintiff's argument that she has competence when she finds it convenient. She argues that although she was incompetent to contract with Landmark for medical services because of her recurrent mental illness, she was competent to convey the property validly to her daughters. This argument is quite contradictory. We conclude that the conveyance was fraudulent and therefore null and void.

We shall now address the three certified questions before us.

I

Both parties stipulated that Claire "had incidents of mental illness requiring, from time to time, her hospitalization at the Institute of Mental Health in Cranston, R.I." Claire argues that she should not be liable for the medical services provided by Landmark because her mental illness precluded her from contracting with Landmark. We disagree.

 Incidents of mental illness alone will not incapacitate a person from making a valid contract provided that person is able to understand the nature and effect of his or her acts. *Sosik v. Conlon*, 91 R.I. 439, 443, 164 A.2d 696, 698 (1960). Claire's prior or subsequent hospitalization for mental illness at the IMH is not determinative of her capacity to contract at the time that she entered Landmark. In the absence of probative evidence that shows that Claire was suffering from mental incapacity at the time services were rendered by Landmark, a general allegation of chronic mental illness does not suffice to negate capacity. *Id.* at 442, 164 A.2d at 698. No evidence was produced to show that Claire was mentally ill and without capacity to contract for services on the dates of her hospitalization between December 14, 1988, and January 12, 1989.

 In addition Landmark correctly argues that even if there had been probative evidence presented that showed Claire's incapacity to contract, she would still be liable for the medical services, in the absence of a valid contract, under the quasi-contract theory. A quasi-contract or an implied-in-law contract is formed when medically necessary services are rendered even without mutual assent. *Hurdis Realty, Inc. v. Town of North Providence*, 121 R.I. 275, 397 A.2d 896 (1979).

"In order to prove a quasi-contract it must be shown that: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant appreciated the benefit, and (3) under the circumstances it would be inequitable for the defendant to retain such benefit without payment of the value thereof." *Id.*

at 278, 397 A.2d at 897 (citing *Bailey v. West,* 105 R.I. 61, 67, 249 A.2d 414, 417 (1969)).

■ These elements of a quasi-contract are all met in this situation. Claire's hospitalization, as it was medically necessary, certainly conferred a benefit on her which she appreciated. It would be inequitable to expect Landmark to confer medically necessary services on patients without an expectation of payment for the value of those services in return. It is undisputed that the services rendered were medically necessary and that the charges for those services were fair and reasonable. Where medical services are necessary and the charges are reasonable, there is a prima facie case for the payment of the amount due. *Memorial Hospital v. Woolf,* 86 R.I. 357, 360, 134 A.2d 397, 399 (1957).

For these reasons we answer the first question by finding that Claire is liable to Landmark for the services rendered to her.

## II

Turning now to the second certified question regarding Landmark's claim for the medical expenses incurred by Louis before his death, we find that Claire is liable for these expenses by virtue of their marital relationship.

Our initial inquiry begins in examining the vitality of the common-law doctrine of necessaries in modern society. We start with a brief historical review of its origins. The property rights of women were virtually nonexistent prior to the initial recognition of married women's property rights in 1844. In 1844 the General Assembly enacted "An Act Concerning the Property of Married Women." Public Laws 1844, p. 270.[1] The act stated in part:

"Section 1. The real estate, chattels real, household furniture, plate, jewels, stock or shares in the capital stock of any incorporated company of this state, or debts secured by mortgage on property within this state, which are the property of any woman before marriage, or which may

become the property of any woman after marriage, shall be and are hereby so far secured to her sole and separate use, that the same, and the rents, profits and income thereof, shall not be liable to be attached, or in any way taken for the debts of the husband, either before or after his death; and upon the death of the husband in the life time of the wife shall be and remain her sole and separate property."

Prior to the recognition of the individual property rights of a married woman, during the state of coverture she enjoyed no individual rights pertaining to the property she may have owned prior to marriage or acquired during the marriage. The state of coverture was virtually a legal disability whereby a woman lost the capacity to contract, to sue, or to be sued individually. "In short, [coverture] stripped a married women of virtually all means of self-support." *Bartrom v. Adjustment Bureau, Inc.,* 618 N.E.2d 1, 3 (Ind. 1993).

"The property rights and liabilities of married women have been enlarged from time to time by the General Assembly of this State until, at the present time, the property of any woman, whether acquired before or after marriage or which may be acquired by her own industry, shall be and remain her sole and separate property free from any control of her husband." *Oken v. Oken,* 44 R.I. 291, 292, 117 A. 357, 358 (1922).

The common-law conception of marriage was that a husband and a wife existed as one identity. *Digby v. Digby,* 120 R.I. 299, 303, 388 A.2d 1, 3 (1978). The legal disabilities of the wife created the need for her reliance on her husband to provide support.

The obligation of spousal support was traditionally imposed only on the husband because, under the common law, only a wife lost all her property rights and the capacity to contract, to sue or to be sued in her own name upon marriage. The unilateral-support requirement upon the husband arose out of the automatic transfer of the wife's economic resources, by operation of law, to the hus-

---

1. This act was first codified into General Laws in 1896, in G.L. 1896, ch. 194, § 1. Subsequent modifications occurred in G.L.1909, ch. 246, § 1; G.L.1923, ch. 290, § 1; G.L.1938, ch. 417, § 1; G.L.1956, § 15–4–1. The present codification exists in G.L.1956 (1988 Reenactment) § 15–4–1.

band. Marriage conferred upon the husband the enjoyment and control of the wife's property and earnings.

The doctrine of necessaries imposed a duty upon a husband to provide his wife with necessary support. Creditors who supplied necessaries to a married woman would have to look to the husband for payment. The doctrine, which attempted to "obviate some of the victimization which coverture would otherwise have permitted," provided a common-law "mechanism by which the duty of support could be enforced." *Bartrom,* 618 N.E.2d at 3.

Medically necessary expenses have been characterized as "necessaries" within the spirit of the doctrine. We have held that a husband is obligated to pay for the medically necessary services rendered to his wife, provided that the charges are fair and reasonable. *Memorial Hospital v. Woolf,* 86 R.I. 357, 134 A.2d 397 (1957); *Tabor v. Tabor,* 73 R.I. 47, 53 A.2d 525 (1947); *see also Theroux v. United States,* 263 F.Supp. 385 (D.R.I. 1967). Although we have never had occasion specifically to consider whether a wife has that same obligation toward her husband, we have never held that she does not. In our analysis we look for guidance to the various approaches of our sister states that have considered this question.

Many states have reviewed the necessaries doctrine and concluded that "the common-law necessaries rule, predicated as it is upon the assumption that husbands bear the sole responsibility of support for their families" is violative of the Equal Protection Clause. *Medical Business Associates, Inc., v. Steiner,* 183 A.D.2d 86, 92, 588 N.Y.S.2d 890, 893 (1992). In response to that determination states have fashioned various legislative schemes to create a modern approach to the necessaries doctrine.

Maryland abrogated the doctrine entirely, concluding that the doctrine should no longer be part of Maryland's common law and that any expansion of the doctrine to include liability of married women should be left to the Legislature. *Condore v. Prince George's County,* 289 Md. 516, 425 A.2d 1011 (1981). In contrast, the Supreme Court of Arkansas decided to uphold the necessaries doctrine "unless altered or repealed by the General Assembly." *Davis v. Baxter County Regional Hospital,* 313 Ark. 388, 392, 855 S.W.2d 303, 305 (1993). The Florida court elected to leave the common law doctrine intact pending legislative review. *Shands Teaching Hospital and Clinics, Inc. v. Smith,* 497 So.2d 644 (Fla.1986). The Supreme Court of Virginia concluded that the doctrine was unconstitutional and should be completely abolished. *Schilling v. Bedford County Memorial Hospital,* 225 Va. 539, 303 S.E.2d 905 (1983). Following that decision, the Virginia General Assembly amended Virginia Code § 55–37 to expressly provide that "[t]he doctrine of necessaries as it existed at common law shall apply equally to both spouses." Va.Code Ann. § 55–37 (Michie 1986). The Connecticut and Illinois Legislatures have reacted by enacting statutes that make both spouses jointly liable for family expenses including reasonable and necessary medical care. *See* Conn.Gen.Stat. § 46b–37 (rev. 1989) and Illinois, 750 ILCS 65/15 (Michie 1993).

■ Most of the jurisdictions that have considered the modern application of the necessaries doctrine have generally held that judicial expansion of the doctrine to include both spouses is the appropriate measure.[2] We follow the pattern of these jurisdictions. In particular we adopt much of the New Jersey Supreme Court's analysis.

The facts in *Jersey Shore Medical Center–Fitkin Hospital v. Estate of Baum,* 84 N.J. 137, 417 A.2d 1003 (1980), are similar to those in the present case. In *Estate of*

---

**2.** *See Bartrom v. Adjustment Bureau, Inc.,* 618 N.E.2d 1 (Ind.1993); *St. Francis Regional Medical Center v. Bowles,* 251 Kan. 334, 836 P.2d 1123 (1992); *Borgess Medical Center v. Smith,* 149 Mich.App. 796, 386 N.W.2d 684 (1986); *Hulse v. Warren,* 777 S.W.2d 319 (Mo.Ct.App. 1989); *Jersey Shore Medical Center–Fitkin v. Estate of Baum,* 84 N.J. 137, 417 A.2d 1003 (1980);

*Medical Business Associates, Inc. v. Steiner,* 183 A.D.2d 86, 588 N.Y.S.2d 890, (1992); *North Carolina Baptist Hospitals, Inc. v. Harris,* 319 N.C. 347, 354 S.E.2d 471 (1987); *Richland Memorial Hospital v. Burton,* 282 S.C. 159, 318 S.E.2d 12 (1984); *Marshfield Clinic v. Discher,* 105 Wis.2d 506, 314 N.W.2d 326 (1982).

*Baum,* the New Jersey Supreme Court found that the common-law necessaries doctrine violated the Equal Protection Clause since it was not applied to both spouses. The husband in *Estate of Baum* owed money for medical expenses, and his estate was insolvent. The court found that an extension of the common-law necessaries doctrine to include an application to wives was appropriate based on the "increasing independence of women, the emerging concept of marriage as a partnership, and the belief that husbands and wives should be treated equally." *Id.* at 140–41, 417 A.2d at 1004.

The New Jersey court pronounced that "both spouses are liable for the necessary expenses incurred by either spouse." *Id.* at 151, 417 A.2d at 1010. They reasoned that a creditor who provided necessaries to one spouse should be able to assume that the financial resources of both spouses are available for payment. *Id.* This decision was not without limitation, however.

The new rule in New Jersey would make the spouse who incurred the debt, either husband or wife, primarily liable and the other spouse only secondarily liable. This limitation was justified by the general principle that "in the absence of an agreement, the income and property of one spouse should not be exposed to satisfy a debt incurred by the other spouse unless the assets of the spouse who incurred the debt are insufficient." *Id.* The court went further to explain this important limitation.

"Normally a person is not liable for the debt of another in the absence of an agreement. The imposition of liability based on marital status alone is an exception to that rule. Nonetheless, it is a justifiable exception. The reasonable expectations of marital partners are that their income and assets are held for the benefit of the marital partnership and, incidentally, for creditors who provide necessaries for either spouse. However, it would be unfair to accord the same rights to a creditor who provides necessaries on the basis of an agreement with one spouse as to a creditor who has an agreement with both spouses. *In the absence of such an agreement, a creditor should have recourse to the prop-*

*erty of both spouses only where the financial resources of the spouse who incurred the necessary expense are insufficient. Marshalling the marital resources in that manner grants some protection to a spouse who has not expressly consented to that debt.*" (Emphasis added.) *Id.*

In the case before us Claire argues that an expansion of the necessaries doctrine to impose liability on wives would be inappropriate. She incorrectly relies on the language of G.L.1956 (1988 Reenactment) § 15–4–12 to argue that she is not liable for her husband's necessary medical expenses. The statute states:

"The husband shall not be liable by reason of the marital relation for any contract made * * * by his wife prior to their marriage; nor shall he be liable for any contract made after marriage by his wife * * * unless he participates therein or coerces her thereto. The wife or her property shall not be liable for the contracts * * * of her husband."

The general principle of law embodied in the statute referred to is that neither spouse is liable for the voluntary contracts of the other. It has no application to the necessaries doctrine, which has previously imposed an obligation on a husband for necessary medical expenses. Similarly it would have no relevance to an expansion of the necessaries doctrine to impose a reciprocal obligation on a wife.

█ As the New Jersey court carefully pointed out, it is important to distinguish between the exemption from liability for the voluntary contracts of a spouse and the requirement of mutual support under the necessaries doctrine. Section 15–4–12 deals with voluntary contracts and does not pertain to necessaries. Exceptions to the general principle of nonliability for the legal obligations of a spouse have been carved out when dealing with obligations within family relationships. Liability for the necessaries furnished to a spouse is one such exception. Notwithstanding the language of this statute, a husband is still liable for the necessary medical expenses furnished to his wife, even when no contract exists between him and a

third party. *See Theroux v. United States,* 263 F.Supp. 385 (D.R.I.1967).

We embrace the New Jersey court's characterization of a modern marriage as a "shared enterprise, a joint undertaking, that in many ways * * * is akin to a partnership." *Estate of Baum,* 84 N.J. at 151, 417 A.2d at 1010 (quoting *Rothman v. Rothman,* 65 N.J. 219, 229, 320 A.2d 496, 501 (1974)). "In a viable marriage, the marital partners can decide between themselves how to pay their debts." 84 N.J. at 151, 417 A.2d at 1010. One of the principal incidents of marriage that continues to evolve has been the obligation of mutual support. Included in this obligation of mutual support is the responsibility of a surviving spouse, "male or female * * * for payment of the deceased spouse's expenses for the last illness and necessities provided by third persons if the deceased spouse's estate is unable to pay therefor, despite the absence of a contract by the surviving spouse to pay such expenses." 41 C.J.S. *Husband and Wife,* § 54 (1991).

Landmark seeks an evenhanded approach to the necessaries doctrine with an eye toward the changing role of women in the modern world. Women are no longer limited to the role of homemaker. Instead they are overcoming obstacles in every social and economic arena of society including most recently military combat training.

■ Although Landmark did not make a constitutional argument for the extension of the obligations of the necessaries doctrine to women, there are constitutional concerns that we must consider in light of the equal protection guarantees provided under both article 1, section 2, of the Rhode Island Constitution and the Fourteenth Amendment to the United States Constitution. Our State Constitution provides individuals with similar equal protection guarantees to those contained in the United States Constitution. *Kleczek v. Rhode Island Interscholastic League, Inc.,* 612 A.2d 734 (R.I.1992). A gender-based classification "denies equal protection in the constitutional sense unless shown to rest on a convincing factual rationale going beyond 'archaic and overbroad generalizations' about the different roles of men and women." *Fortin v. Darlington Lit-tle League, Inc.,* 514 F.2d 344, 348 (1st Cir. 1975) (quoting *Schlesinger v. Ballard,* 419 U.S. 498, 508, 95 S.Ct. 572, 576, 42 L.Ed.2d 610, 618 (1975)).

■ The United States Supreme Court has held that different treatment on the basis of gender establishes a classification subject to scrutiny under the Equal Protection Clause. *Orr v. Orr,* 440 U.S. 268, 278–79, 99 S.Ct. 1102, 1111, 59 L.Ed.2d 306, 318–19 (1979) (citing *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225, 229 (1971)). Under an equal protection analysis, gender-based discrimination is subject to an intermediate level of scrutiny to determine whether it is substantially related to important governmental objectives. *See also Kleczek v. Rhode Island Interscholastic League, Inc.,* 612 A.2d 734 (R.I.1992); *Felice v. Rhode Island Board of Elections,* 781 F.Supp. 100 (D.R.I.1991).

The common-law policy of imposing liability only on a husband for the necessaries of his spouse would certainly qualify as gender-based discrimination. The underlying governmental objective of this commonlaw policy was to provide for a dependent wife who surrendered all her property rights to her husband at the time of marriage. The common-law necessaries doctrine imposing the support burden only on a husband could be justified in the past because it was substantially related to the important governmental objective of providing necessary support to dependent wives. The modern roles of men and women in a contemporary marriage, however, can no longer justify this gender-based discrimination. To continue to adhere to this outdated policy would be to reverse the significant progress women have made in achieving equality. It would be utterly unfair of us to ignore the strides the women have taken in modern society and blindly exempt a wife from paying the necessary medical expenses incurred by her husband simply because she is a woman.

■ Having decided that the common-law necessaries doctrine should be expanded in Rhode Island to impose a mutual burden on both spouses, we must now consider whether this new policy can be equitably

applied to this case. In *Estate of Baum*, the New Jersey court found that the expansion of the necessaries doctrine should be applied prospectively only. 84 N.J. at 152, 417 A.2d at 1011. It is here that we must respectfully part company with our sister state. On the basis of the facts of the present case, we conclude that our expansion of the doctrine should be applied to Claire retroactively.

We have adhered to the factors outlined by the United States Supreme Court in determining

"whether a decision establishing a new principle of law in a civil case will be applied retroactively: (1) whether the new principle established was one whose adoption was clearly foreshadowed; (2) whether retroactive application will further or retard the purposes which motivated the adoption of the rule; and (3) whether inequitable results will ensue from retroactive application." *Marran v. Gorman*, 116 R.I. 650, 653, 359 A.2d 694, 696 (1976) (citing *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296, 306 (1971)).

In *Chevron Oil* Huson suffered a back injury while working on an artificial island drilling rig owned and operated by Chevron Oil Company and located on the Outer Continental Shelf off the Gulf Coast of Louisiana. The issue presented to the Supreme Court was whether the state or federal admiralty law determined the timeliness of the action. The timeliness issue was governed by the Outer Continental Shelf Lands Act, 43 U.S.C.S. 1333. (hereinafter Lands Act).

A line of federal court decisions interpreting the Lands Act made general admiralty law applicable to the outcome of this case. However, while the pretrial discovery proceedings were under way, the United States Supreme Court pronounced in *Rodrigue v. Aetna Casualty and Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), that admiralty law was no longer applicable to cases of this nature. Instead, such cases were referred to state law.

The Supreme Court outlined the three factors above in its analysis of the propriety of a retroactive application of *Rodrigue*. After considering all three factors, it concluded

that a retroactive application of *Rodrigue* would be inappropriate because the decision that overruled a long line of cases could not have been foreseen and such an application would cause substantial hardship.

Analyzing the facts of this case under the scrutiny of the *Chevron Oil* test for retroactive application, we reach a very different result.

Although the application of the necessaries doctrine to women is an issue of first impression in Rhode Island, it is certainly a principle that was clearly foreshadowed by the evolving role of women. Our past decisions imposed such a duty on a husband, but we have never held that a wife would never have a mutual obligation. As early as 1844 married women in Rhode Island were recognized to have individual property rights. The legal disparities between women and men have been consistently eroding to the present state of equality. Judicial determinations regarding alimony, child support, and equitable distribution of marital property in modern divorce proceedings no longer focus on the husband's obligation to support his family, but instead consider the means and circumstances of both spouses in making decisions and awards. *See generally* G.L.1956 (1988 Reenactment) chapter 5 of title 15. Even the language of § 15–4–12, on which Claire relies, provides clear foreshadowing that both spouses are to be treated equally in modern society.

Looking to the second consideration, we conclude that an extension of the doctrine retroactively will further the intended policy of mutual support in the marriage. The concept of a marital partnership creates a responsibility on the part of both spouses for the welfare of the two. Allowing Claire to cling to an outdated application of the necessaries doctrine requiring that only a husband is responsible for the medical necessaries of a wife would reverse the significant progress that women have fought for in achieving social and economic equality.

The third consideration deals with the question of substantial hardship. The substantial hardship in this case would be in allowing a wife to escape liability for the

necessaries of her husband when she is able to pay for them. Claire argues that it would be inequitable to force her to pay for her late husband's medical expenses. We must remind her, however, that one who seeks equity must have "clean hands." Claire's fraudulent conveyance of her property to her daughters in order to avoid liability for even her own medical bills should not be tolerated. To allow her to escape liability for both her medical bills and those of her husband in the name of equity would be unjust. We repeat, one must be just before being generous.

We also note the thoughts of Justice Kelleher when he wrote for this court in *State v. Porter*, 437 A.2d 1368, 1371 (R.I.1981), stating that "a prospective-only approach to the operation of a judicial decision is the exception rather than the rule." Applying the factors set forth in *Chevron Oil* to the present case, we must conclude that a prospective only approach would be inequitable.

■ In addition, Claire argues that if Landmark wanted to secure payment for the hospital bills incurred, it should have followed "a very simple procedure [and] require[d] the execution of a security interest in the real estate owned by the Respondent [Claire] and her husband, or * * * require[d] a personal guaranty from the Respondent [Claire]." The expectation that a hospital must secure a means of payment for the medically necessary services provided prior to rendering such services would result in additional hardship. A hospital must render necessary treatment to individuals regardless of their financial circumstances. This approach to securing payment for medical services would be ineffective. Requiring a hospital to secure payment for services before rendering treatment would lead to delay and hardship for both the hospital and the patients awaiting treatment.

Although Claire acknowledges that some states have expanded the necessaries doctrine to include an application to wives, she further argues that it should not be expanded in her case to impose this financial burden on her because of her inability to work and her economic difficulties. She contends that she is unable to meet this obligation because of her history of mental illness and hospitalization. Even though Claire's ability to pay the debt is a consideration, it is not a controlling factor in the determination of the question of her liability for the debt. Our initial concern is not whether she has the ability to pay the debt but whether the necessaries doctrine should be expanded to find her liable. Her actual ability to pay is a factual inquiry that is best left for the trial court.

We conclude that the necessaries doctrine should be expanded to impose a mutual obligation on both husbands and wives. In light of the factors in *Chevron Oil*, we find no persuasive reason not to apply this expansion retroactively to the present case.

### III

Having set aside the conveyance to her daughters of her principal asset, the real estate, that property may be reachable to satisfy the debt. In the event that this asset was not available to satisfy the debt completely, we would then consider the liability of her children to pay the debt on her behalf.

Landmark asserts two statutory arguments for finding that Gisele and Suzanne are liable for the medical bills of their parents under G.L.1956 (1988 Reenactment) chapter 10 of title 15 and G.L.1956 (1990 Reenactment) § 40–5–13.

■ The provisions of chapter 10 of title 15 impose a criminal penalty upon an adult child who neglects or refuses to provide for support and maintenance of their parent when such a parent is destitute. We have held that "[i]n plain language this statute imposes a clear legal duty, with severe punishment for its nonperformance, upon an adult son or daughter to support an indigent parent in certain circumstances." *Ankney v. Pettine*, 79 R.I. 471, 475, 90 A.2d 430, 432 (1952). This obligation is *"real and existent."* (Emphasis added.) *Id.* In addition the statute also provides for a civil cause of action, as in the case of *Eustis v. Hempstead*, 114 R.I. 219, 330 A.2d 898 (1975).

In *Eustis* a mother was seeking to compel her son to provide her support. The court upheld the statute, providing that the mother was liable to be a public charge and that the

son was able to provide such support. The same would be true for the present case. If Claire were likely to become a public charge, her children would be held accountable for the debt to Landmark on the basis of their ability to pay it.

A factual determination would be necessary to determine the ability of the children to pay the debt if Claire were a public charge. Since we have previously determined that the conveyance of the real estate on Maple Street was a fraudulent transfer and therefore null and void, Gisele and Suzanne have no interest in the property. The interest in that property remains in Claire. Although it seems unlikely, if Claire's interest in the property would not be sufficient to cover the debt to Landmark or if Claire were a public charge, the children would then be responsible for the debt according to their respective abilities to pay.

The second statutory basis for a possible determination that the children are liable for the debt is § 40–5–13 entitled "Obligation of kindred for support." This statute places an obligation upon the kindred of any "poor person," on children as well as other kindred, to support the pauper in proportion to that family member's ability. We have recognized the obligations imposed by this statute in *Roullard v. McSoley,* 54 R.I. 232, 172 A. 326 (1934), and later in *Whitmarsh v. McGair,* 84 R.I. 226, 122 A.2d 748 (1956).

Both statutes provide a means for a creditor to seek payment from Gisele, Suzanne, or any other children in the event that Claire is deemed to be a pauper. Again, that factual determination is better left for the trial court to make. It is clear that by enacting these statutes, the Legislature intended to impose a burden on family members, when able, to provide support for one another. The imposition of a criminal punishment on those who avoid their familial obligations demonstrates the legislative intent to prevent some family members from becoming public charges.

For these reasons we answer the first two certified questions presented to us by concluding that Claire is liable for both her own and her husband's debts to Landmark. We remand the case for a factual determination of her ability to pay the total debt in light of our conclusion that the conveyance of her principal asset, the Maple Street real estate, was null and void.

The issue presented by the third certified question would only be reached in the event that Claire's assets are insufficient to satisfy the debt or that she is determined to be a pauper unable to pay the debt. At that point a factual determination should be made by the Superior Court to assess the ability of each of her children to pay her total debt to Landmark.

FAY, C.J., did not participate.