David BUTERA, d/b/a/ Butera
Building and Design

v.

Richard N. BOUCHER et al.

No. 99–409–Appeal.

Supreme Court of Rhode Island.

May 21, 2002.

Gerard M. DeCelles, Smithfield, for Plaintiff.

David Edward Maglio, III/Richard E. Kirby, Providence, Jonathan Oster, Lincoln, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

The American dream of building a home of one's own can sometimes turn into a nightmare. This case deals with some of the problems that arise when that dream bumps up against the reality of all that can go awry in the construction process. After a jury verdict, two disappointed home-owners and a frustrated builder appeal from a Superior Court judgment that awarded lost profits to the builder and damages for breach of contract to the homeowners. For the reasons crafted below, we affirm the Superior Court's judgment in all respects.

### Facts and Travel

In April 1993, a builder, David Butera (plaintiff or builder) contracted to build an energy-efficient single-family residence for Richard N. Boucher (Boucher) and his wife, Janice E. Boucher (defendants or homeowners), for approximately $175,000. Two days before the date specified in the contract for completing construction, the homeowners terminated the builder's con-tract, alleging lack of job oversight and failure to accomplish substantial construc-tion of the house by August 15, 1993, the completion date specified in the contract. In response, the builder filed a lawsuit in Superior Court, alleging wrongful termi-nation of the contract, slander, malicious prosecution, and abuse of process. The homeowners answered the complaint, raised affirmative defenses, and filed a counterclaim for breach of contract. They also sought damages for the cost of reme-dial work, asserting that the builder had constructed the home in an unworkmanlike manner.

After a trial, a Superior Court jury re-turned a verdict in favor of the builder in the amount of $15,500 for his unrealized profits on this project, finding that the

homeowners had terminated the contract without justification. But it also returned a verdict in favor of the homeowners on the builder's slander claim and awarded them $1,200 on their counterclaim against the builder for breach of contract. After the verdict, both parties moved for a new trial, but the trial justice denied their motions. Thereafter, the homeowners appealed and the builder cross-appealed. The builder argues that the trial justice erred in denying his motion for a new trial on the counts of slander, malicious prosecution, and abuse of process. *See* note 2, *infra.* In support of that assertion, he contends that on or about August 9, 1993, the supplier notified Boucher that a custom-ordered door had been returned for credit. Boucher disputed this fact, asserting that he was not aware that the door had been returned until September 8 or 9. In any event, on September 4, 1993, the homeowners filed a complaint against the builder with the Lincoln Police Department, accusing him of stealing the door. Later that month, Boucher returned to the police to file another complaint, accusing the builder of "fraud and deception." The homeowners also filed a complaint against the builder with the Rhode Island Contractors' Registration Board (board). The builder alleged that the homeowners subjected him to embarrassment and to public humiliation because of these and other accusations and that he had been forced to expend great sums of money financing his defense of these false charges.

The homeowners' appeal argues that both the jury verdict and the trial justice's denial of their motion for a new trial were in error, against the weight of the evidence, and that other procedural errors during the trial deprived them of a fair trial. We address and resolve each of these issues below.

# I

## Quashing the Homeowners' Eve–of–Trial Subpoena For the Builder's Records Concerning Another Project

■ The homeowners asserted that the builder's chronic absence from the job site contributed to the construction delay, justifying their termination of the contract. Just two days before the trial began, the homeowners caused two extremely broad subpoenas *duces tecum* to be served on the builder, requiring him to produce a great number of documents, including, *inter alia,* his construction files and records for another house that he also was building while he was under contract to build the house for these homeowners. In response to the builder's motion to quash, the trial justice limited the scope of the records he had to produce by quashing the request for records pertaining to his other construction project. On appeal, the homeowners argue the court's granting of the motion to quash prejudiced them, and that their "defenses to [the builder's] petition for wrongful termination had essentially been emasculated * * *."

The trial justice concluded that the records in question were "not relevant to this case," and that, in any event, the contract did not prevent the builder from constructing more than one home at a time. Furthermore, he found that contractors do not keep attendance records of the days and hours they spend on various job sites, especially when they have agreed to a contract price. In sum, it was the trial justice's judgment that the subpoenaed documents had nothing to do with the gravamen of the claims at issue in this case because, regardless of the builder's other contractual commitments, contractors "have to comply with the terms of their contract." We agree.

Additionally, the homeowners' eve-of-trial issuance of a blunderbuss subpoena—

requesting the builder to produce reams of documents—was both overbroad and untimely because they served the subpoena on him just before trial without giving him adequate time to gather, review, and produce the requested records. *Compare* Rule 34 of the Superior Court Rules of Civil Procedure (allowing parties forty days to respond to document requests) *with* Rule 45 of the Superior Court Rules of Civil Procedure (allowing parties to subpoena trial witnesses and to require them to bring specified documents with them). In any event, the subpoena was objectionable because of its gross overbreadth. In *National Exchange Bank v. Lubrano*, 29 R.I. 64, 68 A. 944 (1908), this Court held that a trial justice properly quashed a subpoena *duces tecum* when the defendant moved for a writ of subpoena *duces tecum*, during trial, after the plaintiff had closed its case. The Court in *Lubrano* held that the defendant could have called a witness available in the court to provide testimony concerning the matter, and that in any case, it did not appear that the information, if produced, would have been material to the controversy.

■ When an analogous federal rule and our own state rule of civil procedure are similar, this Court has looked to the federal courts for interpretative guidance in applying the rules in question. *Heal v. Heal*, 762 A.2d 463, 466–67 (R.I.2000). Several federal district courts have held that a Rule 45 subpoena *duces tecum*, when used as a means of belated discovery, should not be allowed to circumvent the discovery deadlines for parties established by the other rules of civil procedure or by court order. *See Dreyer v. GACS, Inc.*, 204 F.R.D. 120 (N.D.Ind.2001); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556 (S.D.Cal.1999); *Rice v. United States*, 164 F.R.D. 556 (N.D.Okla. 1995). For example, in *Marvin Lumber and Cedar Co. v. PPG Industries, Inc.*, 177 F.R.D. 443 (D.Minn.1997) the court recognized that, although subpoenas can be used as a means of discovery, they, too, are subject to Rule 26 of the Federal Rules of Civil Procedure, and to the same time constraints and other limitations that apply to other methods of discovery. The court also recognized that, when used improperly, a Rule 45 subpoena "unnecessarily lengthens [the] discovery process, and diverts the parties' attention, from the post-discovery aspects of preparing a case for Trial." *Id.* at 445. As a general proposition, we subscribe to the notion that "parties should not be allowed to employ a subpoena after a discovery deadline [on the eve of trial] to obtain materials from third parties [or parties] that could have been produced before discovery [closed]." Charles Alan Wright & Arthur. R. Miller, 9A *Federal Practice & Procedure* § 2452 (Supp.2002).

Here, the trial justice considered that the subpoenaed documents either were irrelevant or immaterial to the breach-of-contract claim in question. Moreover, the builder acknowledged that he was working on two construction projects, and this fact was not lost on the jury during the trial. Under these circumstances, we are of the opinion that the trial justice exercised appropriate discretion in granting the motion to quash this overbroad, eve-of-trial subpoena insofar as it sought to obtain documents pertaining to the builder's other continuing construction project. This information was not discovered in a timely fashion and, if introduced into evidence, it could have confused the jury, encouraged speculation on an immaterial point, and delayed the trial. Moreover, the homeowners suffered no prejudice from this ruling because the evidence was undisputed that the builder did not personally spend most of his working time at the site.

## II

### The Challenged Jury Instructions

#### A. Substantial Performance

■ The homeowners next argue that the trial justice erred in failing to instruct the jury on the issue of substantial performance of a contract. During the trial, the homeowners' attorney suggested the following jury charge:

"With regard to the claim asserted by David Butera, d/b/a/ Butera Building and Design that he was discharged by the Defendants after having performed his obligations under the contract, you are instructed that in order for you to find in favor of Mr. Butera, you must first find that Mr. Butera had substantially performed his obligations under the contract. If you find that Mr. Butera did not substantially perform under the terms of the written contract, he is precluded from recovering from breach of contract."

The trial justice declined to give this instruction, stating that the doctrine of substantial performance was inapplicable in this case because the builder "was terminated before [the contract] was completed." The trial justice also observed that, even according to the contract, there still were two days left to complete the house when the homeowners terminated it and that the contract did not specify that time was of the essence. He reasoned that it would be inconsistent to give a substantial-performance charge and then tell the jury that time was not of the essence under this contract.

■ In reviewing a trial justice's charge to a jury, we examine the charge "in its entirety, 'in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give [to the instructions].'" *Patino v. Suchnik*, 770 A.2d 861, 866 (R.I.2001) (quoting *Neri v. Nationwide Mutual Fire Insurance Co.*, 719 A.2d 1150, 1153 (R.I.1998)). "An erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." *Id.* (quoting *Brodeur v. Desrosiers*, 505 A.2d 418, 422 (R.I.1986)).

■ Substantial performance entitles a party to the contract to recover the contract price less the amount needed by the party benefiting from that performance to remedy any defects in the work. *National Chain Co. v. Campbell*, 487 A.2d 132, 135 (R.I.1985); *see also* 13 Am.Jur.2d *Building and Construction Contracts* §§ 46–48 (2000). This doctrine, however, is inappropriate in situations such as this one in which the owner has terminated the builder's contract before the builder has had an adequate opportunity to complete the performance required under the contract. In other words, the substantial-performance doctrine does not apply when, as here, the builder is still in the act of *performing* the contract when the owner has purported to terminate it. Thus, the substantial-performance doctrine ordinarily is applicable only when the time for completion has past because, until that time, the contractor still may be able to remedy any alleged defects in the performance. *See Wells Benz, Inc. v. United States*, 333 F.2d 89, 95 n. 5 (9th Cir.1964). Thus, the homeowners' reliance on *National Chain Co.* as well as *DiMario v. Heeks*, 116 R.I. 44, 351 A.2d 837 (1976) is misplaced because, unlike the contract in this case, those cases involved completed contracts.

■ Furthermore, a builder who fails to substantially perform a construction contract still is entitled to recover the contract price minus the cost of completion and correction when the contract has been

so far performed that the structure can be used by the owner for its intended purpose or the work is of some value to the owner. *See Mahoney v. Galokee Corp.*, 214 Kan. 754, 522 P.2d 428 (1974); *Kulseth v. Rotenberger*, 320 N.W.2d 920 (N.D.1982); see also 13 Am.Jur.2d *Building and Construction Contracts* § 84 (2000). "A party to a building and construction contract who has performed part of it according to its terms, but is prevented by the other party from completing the contract, may recover compensation for the work performed and the materials furnished." 13 Am.Jur.2d *Building and Construction Contracts* § 50 (2000). *See also Harris v. Holder*, 217 Ark. 434, 230 S.W.2d 645 (1950); *Valente v. Weinberg*, 80 Conn. 134, 67 A. 369 (1907); *Parrish v. Tahtaras*, 7 Utah 2d 87, 318 P.2d 642 (1957).

This is precisely what happened in this case, as the homeowners' attorney conceded in his argument for a new trial. Although the jury held that both parties were liable for breaching the contract, it awarded the builder $15,500 for lost profits after concluding that the homeowners prematurely terminated the contract. But it also awarded the homeowners $1,200 to remedy defects in the builder's performance; namely: "cracks in the garage." In short, a builder can recover for lost profits, even though he has not substantially performed the contract, if the owner has breached the contract by terminating it without justification before the completion date. For these reasons, we hold, the trial justice did not err in failing to instruct the jury in accordance with the homeowners' proffered jury instruction that tied the builder's recovery to whether he had substantially performed the contract.

### B. Adequate–Staffing Instruction

The homeowners also argue that the trial justice erred in failing to instruct the jury on the builder's alleged failure to adequately staff this home-construction project. The contract stated, in pertinent part:

> "In the prosecution of the work, the builder shall at all times keep a competent foreman and a sufficient number of workers skilled in their trades to suitably perform their work. The foreman shall represent the builder and, in the absence of the builder, all instructions given by the owner to the foreman shall be binding upon the builder as though given to the builder. Upon request of the foreman, instructions shall be in writing and signed by the owner."

Because the homeowners attributed the builder's personal absence from the job site to the delay in the builder's completion of the house, they requested the following instruction to be given by the court to the jury:

> "The Defendants have asserted that Mr. Butera breached the contract in a number of ways. First, they allege that Mr. Butera failed to provide adequate and consistent staffing at the project site in violation of the section of the contract entitled 'Labor and Supervisor' on page 2 of the contract. If you find that Mr. Butera failed to provide a 'competent foreman and a sufficient number of workers skilled in their trades to suitably perform the work,' then you must find for the defendants and against the plaintiff on the Plaintiff's breach of contract claim."

The trial justice correctly noted that during the trial the homeowners offered no evidence concerning the builder's alleged inadequate staffing of the job site. While he was away from the site, the builder had assigned site-foreman authority to a framer who was one of his subcontractors. The homeowners argue that the foreman-fram-

er, Dean Racicot, "was simply a framer and not a site foreman," and that the builder "would stop by in the morning, at best." Significantly, the trial justice recognized that the homeowners had selected Racicot—the builder's framer—to be their new general contractor after they terminated the builder's contract. Furthermore, Racicot also served as an expert witness for the homeowners during the trial of this case. Under these circumstances, we conclude, the trial justice did not err in failing to give the requested instructions. The homeowners' proof at trial simply did not warrant such charges to the jury.

■■■ Additionally, the homeowners argue that the trial justice erred when he failed to instruct the jury, as they had requested, about the "change order procedures or adjustments in contract price and completion time." But as we stated in *Patino*, we will not consider on appeal a party's objection to jury instructions unless the objection was " 'specific enough to alert the trial justice as to the nature of his alleged error.' " *Patino*, 770 A.2d at 866–67. Rule 51(b) of the Superior Court Rules of Civil Procedures states "[n]o party may assign as error the giving or the failure to give an instruction unless [they state] * * * distinctly the matter to which the party objects and the grounds of the party's objection." The record in this case shows that the homeowners failed to preserve their objection to the court's failing to give this proposed jury instruction concerning change-order procedures, price adjustments, and completion time, because they did not specifically advise the trial justice in what way the instructions the court proposed to give allegedly were defective. Merely calling the trial justice's attention to a proposed jury instruction that he or she has not given to the jury is inadequate to preserve any objection

thereto for appeal. Here, all that was said on this issue is as follows:

"DEFENDANT: No. 6, Judge.

"THE COURT: I gave them a charge on that. If you find it's clear and unambiguous you must enforce the terms, but if there's any ambiguity, you must determine what the intention of the parties were * * *. What else?

"DEFENDANT: No. 7 Judge * * *."

As this excerpt reveals, the homeowners proceeded to the next requested jury charge without specifically advising the trial justice of the alleged error in the court's failure to instruct the jury in accord with their proposed instruction "No. 6." Hence, the homeowners failed to preserve this objection for appeal.

## III

### Denial of New–Trial Motion

■■■ The homeowners next argue that the jury verdict was against the weight of the evidence, and that, thereafter, the trial justice should have granted their motion for a new trial. In considering a motion for a new trial, if the trial justice " 'reviews the evidence, comments on the weight of the evidence and the credibility of the witnesses, and exercises his [or her] independent judgment, his [or her] determination either granting or denying a motion for a new trial will not be disturbed unless he [or she] has overlooked or misconceived material and relevant evidence or was otherwise clearly wrong.' " *English v. Green*, 787 A.2d 1146, 1149 (R.I.2001) (quoting *Kurczy v. St. Joseph Veterans Association, Inc.*, 713 A.2d 766, 770 (R.I.1998)).

The homeowners contend that the builder failed to prove his damages with specificity, and that he speculated about the amount of damages. Furthermore, they maintain, the jury's finding, on the one

hand, that the builder breached the contract, and, on the other hand, that he was entitled to damages for lost profits, was clearly wrong and not supported by competent evidence. The homeowners also argue that the trial justice did not exercise independent judgment when he ruled on the new-trial motion.

We are of the opinion that the trial justice reviewed the evidence in a methodical and thoughtful manner. He did not misconceive or overlook material evidence when he found that reasonable minds could conclude that the builder was at least partly deserving of compensatory damages for his lost profits because of the homeowners' wrongful termination of the contract. The trial justice found that title to the property still had not passed to the homeowners when the builder was supposed to begin constructing the house. In fact, the homeowners were unable to close on the property until three weeks later than the original closing date. And the building permits for the house did not issue until two weeks after the closing on May 28. Further, the homeowners failed to submit their first payment to the builder until May 29. The jury was entitled to conclude that these circumstances pushed back the builder's ability to complete the project by the August 15 date specified in the contract.[1] Indeed, the contract's August 15 completion date was expressly "[d]ependent on complete transfer of clear title and financing to be completed by April 21," neither of which occurred by that date.

Furthermore, the trial justice found that the homeowners were personally involved in the work on this project; indeed, Boucher himself was usually on the site every morning by 7 a.m. Boucher also ordered the windows for the house, chose the subcontractor that would excavate the property, and bought materials from various suppliers for the construction of the home. His personal involvement in some instances caused additional delays in completing the project. Based on the evidence, the trial justice ruled that it was unreasonable for the homeowners to believe that the builder would finish the job by August 15, and that the terms of the contract itself did not state that time was of the essence. Both the trial justice and the jury found that, given the above-referenced delays that were beyond the builder's control and the absence of a time-is-of-the-essence clause, the homeowners had breached their contract with the builder when they prematurely terminated the contract on August 13. We lack any basis to conclude that they erred in doing so.

With respect to the $15,500 in damages that the jury awarded to the builder, the trial justice found that the builder's mechanic's-lien exhibit showed that the homeowners owed him $12,066 for work he already had completed at the site when the homeowners wrongfully terminated the contract. There was also testimony that the builder expected to make a profit of $15,961 on this project. As the trial justice concluded, "[the jury] accepted the testimony of Mr. Butera that he ex-

---

1. Although the contract specified that work on the house would be completed by August 15, the contract itself conditioned that date upon the timely completion of certain other antecedent events:

"various portions of the work shall be completed on or before the following days: *Dependent on complete transfer of clear title and financing to be completed by April 21,*

completion of all required engineering and scheduling for the excavation, work to begin one week after the transfer of title, on April 28, 1993 and *the entire work shall be completed on or before the 15[sic] day of August, 1993.* This day will be revised, if necessary, after the shell is weather tight and the first disbursement is made by FIRSTFED." (Emphases added.)

pected to make $15,961 profit on the contract. * * * I don't think the jury speculated in the case * * * so I think the award of $15,500 is appropriate in this case for the Plaintiff, and I will deny the Motion for New Trial on that basis."

▮ Damages do not have to be calculated with mathematical exactitude; all that is required is that they are based on reasonable and probable estimates. *See Rhode Island Turnpike Authority and Bridge Authority v. Bethlehem Steel Corp.*, 119 R.I. 141, 167–68, 379 A.2d 344, 358 (1977). "This court has held that 'a damage award may be disregarded by the trial justice and a new trial granted only if the award shocks the conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in assessing the fair amount of compensation to which a party is entitled.'" *English*, 787 A.2d at 1150 (quoting *Dilone v. Anchor Glass Container Corp.*, 755 A.2d 818, 820–21 (R.I.2000)). We are persuaded the trial justice did not err in ruling that the jury's award of damages to the builder was reasonable, not speculative, and that it responded to the evidence presented during the trial. Consequently, we decline to overturn his decision denying the homeowners' motion for a new trial.

## IV

### Denial of Judgment as a Matter of Law and Denial of Motion for a New Trial on the Slander Count

▮ The jury returned a verdict for the homeowners on the builder's claim for slander. In his cross-appeal, the builder alleges that Boucher went on a "prosecutorial rampage" after being served with a mechanic's lien for the builder's work. In particular, Boucher filed successive complaints with the Rhode Island Contractors' Registration Board (board) and with the Lincoln Police that the builder had stolen building materials, particularly a custom-ordered door, from the job site. After the jury found for the homeowners on this slander count, the builder moved for a judgment as a matter of law, as well as for a new trial on this count. The trial justice denied both motions.

▮ It is well settled that this Court will not disturb the decision of a trial justice to grant or deny a motion for new trial if that justice reviewed the evidence, commented on the weight of the evidence, and evaluated the credibility of the witnesses, while applying his or her independent judgment. *Anderson v. Botelho*, 787 A.2d 468, 471 (R.I.2001) (citing *Kurczy*, 713 A.2d at 770). On the other hand, "an improperly supported decision [on a motion for new trial] is deprived of the weight it is normally accorded." *Id.* (quoting *Lariviere v. Dayton Safety Ladder Co.*, 525 A.2d 892, 900 (R.I.1987)). If a trial justice has failed to perform his function in analyzing the evidence and passing upon the credibility of the witnesses, this Court will apply "the appellate rule," and "the jury's verdict will be sustained if as we examine the evidence in the light most favorable to the prevailing party, there is any competent evidence which supports the verdict." *Id.*

When the trial justice denied the builder's motion for a new trial on his slander claim, he remarked, "the jury obviously felt that Boucher filed his complaint in good faith. I disagree with this * * * I think he did it for spite and ill will * * *." Despite this observation, however, the trial justice denied the builder's motion for a new trial without indicating whether he believed that the verdict was against the weight of the evidence. Therefore, because the trial justice failed to perform his

function on this aspect of the builder's new-trial motion, we will proceed to examine the evidence under the "appellate rule" doctrine.

In doing so, we conclude that the record contains evidence that supports the jury's verdict for the homeowners on the builder's slander claim. The parties' relationship had turned sour and contentious after the homeowners ended the contract in mid-August. Thereafter, the homeowners complained to the Lincoln police that the builder had stolen a door from the job site, together with other building supplies costing in excess of $500. If true, this would amount to accusing the builder of criminal misconduct. Although the evidence established that the supplier sold the door in question to Boucher himself, who later requested the builder to "[t]ake this door back," the homeowner testified that he was not aware that the builder had returned the door until September 8 or 9, several days after reporting the builder's alleged theft of the door to the Lincoln police. The supplier of the door, however, testified that he informed the homeowner no later than August 9, when he came into the supplier's store to order a new door, that the builder already had returned the old door. Given this disputed evidence, the jury was entitled to believe Boucher and to conclude that he possessed a good-faith basis to charge the builder with theft of the door before he became aware of its return to the supplier.

The court also instructed the jurors on the homeowners' qualified privilege to complain about the builder to the appropriate authorities, *see Ponticelli v. Mine Safety Appliance Co.*, 104 R.I. 549, 247 A.2d 303 (1968), advising them that the homeowners should prevail on the builder's slander claim if they possessed a good-faith basis to publish the statement about the builder's alleged theft of the door to the authorities. The trial justice told the jury that:

"In order for the Plaintiff to prevail in this defamation action, he must prove that in addition to the false and defamatory statement that the Defendant, Richard Boucher, did not have what we call a qualified privilege to publish the statement. A qualified privilege exists when a party, in good faith and for the purposes of bringing a criminal to justice, communicates the alleged commission of a crime to a law enforcement officer. However, the qualified privilege is lost if the Plaintiff can show that the primary motivating force for the communication was ill will or spite towards the Plaintiff."

Given the conflicting evidence on this point, the jury could have concluded that the homeowners acted pursuant to their qualified privilege to communicate the alleged commission of a crime when they informed various law-enforcement authorities about the builder's alleged theft of the door and his other supposed misconduct. Although the evidence showed that the homeowners were angry and frustrated by the builder's failure to complete the construction of their house as per the August 15 contract date, the last time Boucher observed the patio door was when he saw the builder removing it from the building site. Furthermore, the builder later conceded that lumber missing from the site had been returned to the supplier and mistakenly credited to the builder's account instead of to the homeowners' account. After hearing this evidence, a reasonable jury could have concluded that the homeowners had leveled these charges against the builder in good faith. As a result, we hold, the trial justice did not err in denying the builder's motion for a new trial on the slander count.

## V

### Denial of Judgment as a Matter of Law On the Malicious–Prosecution And Abuse–of–Process Counts

■ The trial justice granted the homeowners' motion for judgment as a matter of law on the builder's claim for malicious prosecution under Rule 50 of the Superior Court Rules of Civil Procedure.[2] An action for malicious prosecution, or "wrongful civil procedure," lies whenever a defendant (1) has instituted or continued to press a civil claim; (2) which terminated in favor of the plaintiff; (3) when the defendant had no probable cause to believe in the validity of the proceeding or pursued the claim with malice toward the plaintiff and, consequently; (4) injured the plaintiff. *See* W. Page Keeton, *Prosser & Keeton on the Law of Torts* § 120 at 892–93 (5th ed. 1984) (*Prosser*). *See also Nagy v. McBurney*, 120 R.I. 925, 392 A.2d 365 (1978); *Powers v. Carvalho*, 117 R.I. 519, 368 A.2d 1242 (1977).

■ In this case, the trial justice correctly found that there was no favorable termination for the builder in connection with the malicious-prosecution count concerning the homeowners' claims, Numbers 869 and 870, filed with the board on September 23, 1993. Because the board had "discontinued processing" these claims, it never held a hearing on the merits of the homeowners' breach of contract and negligence charges.[3] Although claims 869 and 870 alleged mostly charges of construction defects and discrepancies in costs, the homeowners still maintained at the time of this filing that the patio door was "taken off site by D. Butera, no credit given even though door was paid in full." Without a determination favorable to the builder, his malicious-prosecution claim could not survive a dismissal motion. In *Nagy*, this Court ruled that "a plaintiff, in order to maintain an action for malicious prosecution, must show that the original proceeding against him *finally* terminated in his favor." *Nagy*, 120 R.I. at 931, 392 A.2d at 368. (Emphasis added.) "[W]hen a proceeding is withdrawn merely in order to substitute immediately another one for the same offense, it is to be regarded as one *continuous proceeding, which is not* terminated." *Prosser*, § 119 at 875. Furthermore, any proceeding "which does not terminate [the action] but permits it to be renewed * * * cannot serve as a foundation for the action [of malicious prosecution]. * * * [I]t will be enough that the proceeding is terminated in such a manner that it cannot be revived * * *." *Id.* at 874, 392 A.2d 365.

Here, the board's executive director testified that he had sent a letter concerning claims 869 and 870 to the builder's attorney stating: "In reviewing the above claims and the fact that the contract is subject to litigation in Superior Court, * * * the Board will discontinue processing these claims." Based on above-stated

---

**2.** The trial justice decided not to address the abuse of process claim because the builder did not plead it as a separate count. In paragraph 21 of the complaint, the builder alleged: "[the homeowners'] actions were wanton, reckless, willful, malicious prosecutions and abuses of process." The trial justice considered this language and determined, "[t]hat's not a count for abuse of process."

**3.** After oral argument, the homeowners' attorney moved for leave to correct certain mis-

statements he had uttered during oral argument. We grant the motion. One of them concerned the board's discontinuance of certain claims because of the pendency of the Superior Court action between the parties. Although the homeowners' attorney had denied this fact during oral argument, his motion admitted that the board dismissed these claims because of the pendency of the Superior Court action relating to these claims.

authority and the fact that the board discontinued processing the claims because of the pendency of litigation between the parties in the Superior Court, the court properly granted judgment as a matter of law on the malicious-prosecution count because no final termination of the board's proceeding had occurred.

Later, the homeowners filed another claim (No. 1240) with the board against the builder after the board had discontinued claims 869 and 870. The board thereafter dismissed claim No. 1240 at a hearing held on September 20, 1994. This claim alleged that the builder was not registered with the board at the time the parties executed the contract, but that he had used his father's registration number on the contract. A witness testifying on behalf of the board at the trial said that the board's records on this claim had been destroyed three years after the hearing, and only the fact that it had been dismissed remained in the computer file, but the board's records did not disclose any reason for the dismissal. Although the trial justice failed to address this particular claim specifically, on this scant record we hold that the builder failed to meet his burden of proving that this dismissal showed the claim *finally* had terminated in his favor as required under *Nagy* for it to trigger a malicious-prosecution claim. Therefore, this claim also did not meet the required element of a "favorable termination" to satisfy a claim for malicious prosecution.

 On the other hand, the trial justice erred when he did not address or recognize the builder's claim for abuse of process, which was embedded in the malicious-prosecution count of the complaint. *See* note 2, *supra.* "[V]agueness, lack of detail, conclusionary statements, or failure to state facts or ultimate facts, or facts sufficient to constitute a cause of action are no longer * * * fatal defects." *Bragg*

*v. Warwick Shoppers World, Inc.,* 102 R.I. 8, 12, 227 A.2d 582, 584 (1967). All that is required is that the complaint give the opposing party fair and adequate notice of the type of claim being asserted. *See Haley v. Town of Lincoln,* 611 A.2d 845 (R.I. 1992). Although it is obvious that the count of abuse of process "could have been framed with more particularity, we believe that [the pleadings] provided the * * * defendants with more than sufficient notice of the type of claim that [the builder] was asserting against them in [his] complaint as well as the relief sought." *Hendrick v. Hendrick,* 755 A.2d 784, 791 (R.I. 2000).

 "Abuse of process, as distinguished from malicious prosecution, 'arises when a legal proceeding, although set in motion in proper form, becomes perverted to accomplish an ulterior or a wrongful purpose for which it was not designed.'" *Clyne v. Doyle,* 740 A.2d 781, 783 (R.I. 1999) (quoting *Hillside Associates v. Stravato,* 642 A.2d 664, 667 (R.I.1994)). "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion * * *." *See Prosser,* § 121 at 898.

 In *Nagy* we stated that for a plaintiff to prove abuse of process, he or she must demonstrate that (1) the defendant instituted proceedings or process against the plaintiff and (2) the defendant used these proceedings for an ulterior or wrongful purpose that the proceedings were not designed to accomplish. *Nagy,* 120 R.I. at 934, 392 A.2d at 370. Furthermore "[a] judicial process must in some manner be involved." *Prosser,* § 121 at 898. In this case, the homeowners' reports of alleged theft to the police, which

only resulted in an investigation and no arrest or "process," failed to satisfy this essential element. With respect to the homeowners' claims filed against the builder before the board, this Court ruled in *Hillside* that a hearing before an administrative body, such as the board, can constitute legal proceedings which "embody sufficient trappings of the judicial process to support claims for malicious prosecution and abuse of process." *Hillside Associates*, 642 A.2d at 669. The claims—869 and 870—filed against the builder essentially were comprised of detailed lists of specification deviations and cost discrepancies, as well as complaints about the builder's general lack of oversight and follow-through on the project, all of which supposedly delayed its completion. The third complaint filed by the homeowners—claim number 1240—reported a discrepancy in the registration number that appeared on the contract from the number that appeared on the building permits. The testimony showed that the builder had used his father's registration number on the contract, but his own number on the building permits. The gist of an abuse-of-process claim is the misuse of legal process to obtain an advantage, "not properly involved in the proceeding itself * * *. [However], *even a pure spite motive is not sufficient where process is used only to accomplish the result for which it was created.*" *Prosser*, § 121 at 897. (Emphasis added.)

Here, part of the board's *raison d'être* was to iron out disputes between contractors and homeowners, allowing homeowners to file claims, to utilize dispute resolution, and to seek fines against contractors for alleged violations of applicable laws and regulations, when appropriate. Given the jury's verdict in favor of the homeowners on the builder's slander claim and on the homeowners' breach-of-contract claim against the builder, the homeowners did not use the authority of the board only to obtain "a result for which [the process] was [not] created." Here, because the jury found that the builder was liable for certain defective work, the homeowners were privileged to file their complaints with the board to assure that their home would be built in the time frame and to the specifications they had agreed to in the contract. Furthermore, given the discrepancy in the builder's registration numbers, the homeowners were justified in complaining about whether the builder they had hired was registered with the board at the time they entered into their contract. General Laws 1956 § 5–65–3(a) prohibits contractors to "undertake, offer to undertake, or submit a bid to do work as a contractor" without a valid certificate of registration from the board. The statute prohibits a municipal entity from issuing a building permit to anyone who is required to be registered with the board, but who does not hold such certification. Given their deteriorating relationship with their builder and the defective work on their home, the homeowners were entitled to initiate proceedings before the board because they had adequate grounds to do so. Moreover, this Court has viewed abuse-of-process actions with disfavor because "they tend to deter the prosecution of crimes and/or to chill free access to the courts." *Clyne*, 740 A.2d at 782 (quoting *Brough v. Foley*, 572 A.2d 63, 66 (R.I. 1990)). Therefore, we hold, given the jury's verdict on the slander claim and its award of damages against the builder for certain defective work, the evidence showed that homeowners "'possessed a good faith belief'" that the builder had deviated from the terms of their agreement, and that he was operating under a certificate of registration that was not his own when they complained to the board. *Id.* at 783. Thus, the trial justice did not

err in granting judgment as a matter of law on this count of the complaint.

### Conclusion

We deny the homeowners' appeal in its entirety and uphold the trial justice's decision to quash the subpoena for the builder's records concerning another construction project. We also reject the homeowners' challenges to the trial justice's jury instructions concerning substantial performance, and to the court's "adequate-staffing" charge. And we affirm the court's denial of the homeowners' motion for a new trial. Finally, we deny the builder's appeal on the slander, abuse-of-process, and malicious-prosecution claims. Thus, we affirm the Superior Court judgment in all respects.