[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
The plaintiff, Michael C. Normandin ("Normandin" or "the plaintiff"), has petitioned this Court for monetary damages resulting from the defendants' alleged breach of contract and for an order of specific performance of the parties' purchase and sale agreement. The defendant sellers, Cheryl A. Gauthier ("Gauthier"), CAG Land Corp., and CAG Hospitality Corp. (collectively, "the defendants"), have counterclaimed, seeking compensatory and punitive damages and have filed a third party complaint against their real estate brokers, Maria Caetano and Gloria Donnelly, d/b/a Caetano Real Estate ("Caetano"). Caetano has, in turn, filed a counterclaim against the defendants seeking the six percent commission to which it claims entitlement. Jurisdiction in this Court is pursuant to G.L. 1956 §§ 8-2-13 and 8-2-14.
 TRAVEL OF THE CASE
The plaintiff filed a verified complaint alleging that on or about May 8, 2003, he and the defendants executed a written purchase and sale agreement outlining the terms of the sale of a piece of commercial real estate located at 86 Waterman Avenue, North Providence, Rhode Island, from the defendants to the plaintiff. The final closing date for the sale was set for September 30, 2003. Prior to that time, a contractor hired by the plaintiff's lender inspected the premises and became suspicious that there was an underground oil storage tank on the premises. In order to confirm or dispel this suspicion, the lender proposed performing a small excavation at the plaintiff's expense. Normandin claims that the defendants refused to permit the excavation, thus preventing the closing from going forward, and advised the plaintiff that they would not convey the property to him, thereby breaching the purchase and sale agreement. Plaintiff alleges that at all relevant times he was ready, willing, and able to purchase the property. The plaintiff seeks damages resulting from the alleged breach and specific performance of the purchase and sale agreement.
The defendants admit the existence of the purchase and sale agreement but assert that the plaintiff insisted on carrying out a "huge excavation." They further assert that allowing the excavation was not a valid contingency or condition for closing, and the failure to allow it was not a breach. In their counterclaim, the defendants allege that the plaintiff breached the purchase and sale agreement because he indicated that he would not proceed with the transaction. They also allege that Normandin was not ready, willing, and able to purchase the property. The defendants therefore claim entitlement to the deposit paid into escrow by the plaintiff, along with other damages. They further allege that the plaintiff's breach of contract claim is frivolous, requesting an award of fees, costs, and interest. Finally, the defendants demand compensatory and punitive damages on claims of slander of title and abuse of process, alleging that the filing of the notice of lis pendens was based on a frivolous claim.
In their third party complaint, the defendants allege that they entered into a listing agreement with Caetano, which produced Normandin as a potential buyer. The defendants allege that the brokers are in possession of the deposit paid by the plaintiff and have wrongfully failed to deliver it to them. Further, the defendant alleges that Caetano breached its listing agreement with the defendants in that it did not properly investigate the financial condition of the plaintiff.
The third party defendants assert as an affirmative defense that they have sent Normandin's deposit to the Rhode Island General Treasurer pursuant to state law. They also deny breaching any duty that they may have owed to the defendants. In addition, they filed a counterclaim against the defendants, seeking payment of the six percent commission provided for in the listing agreement, claiming that they fully performed by producing an eligible buyer. To this, the defendants respond by admitting that no commission had been paid, but denying that Caetano has earned it.
Prior to the trial of this case, the defendants moved the Court to enjoin the plaintiff from continuing to assert a lis pendens against the property. A justice of the Superior Court, noting the complexity of the issues involved and the possible harm to the parties' interests, consolidated the hearing on the motion with the trial on the merits in accordance with Super. R. Civ. P. 65(a)(2). The case was tried before this Court, sitting without a jury, on February 7, 2005.
 STANDARD OF REVIEW
In all actions tried upon the facts without a jury, the trial justice "sits as trier of fact as well as law," weighing and considering the evidence, determining the credibility of witnesses, and drawing inferences from the evidence presented. Hood v. Hawkins, 478 A.2d 181, 184
(R.I. 1984). "The task of determining credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury."State v. Sparks, 667 A.2d 1250, 1251 (R.I. 1995) (citing Walton v.Baird, 433 A.2d 963, 964 (R.I. 1981)) see also Rodriques v. Santos,466 A.2d 306, 312 (R.I. 1983) (the question of who is to be believed is one for the trier of fact). When rendering a decision in a non-jury trial, the Rhode Island Supreme Court has held that "the trial justice need not engage in extensive analysis to comply with this requirement."White v. LeClerc, 468 A.2d 289, 290 (R.I. 1983). Thus, "even brief findings will suffice as long as they address and resolve the controlling factual and legal issues." Id.
When the Court sits in equity, it has great discretion to "determine the appropriateness of, and to formulate, equitable relief," guided by "basic principles of equity and justice." Ruggieri v. East Providence,593 A.2d 55, 57 (R.I. 1991) (quoting East Providence v. Rhode IslandHospital Trust National Bank, 505 A.2d 1143, 1145-46 (R.I. 1986)). The findings of a trial justice sitting in equity will not be disturbed unless he or she is clearly wrong or has misconceived or overlooked material evidence of a controlling issue. Ruggieri, 593 A.2d at 55.
 FINDINGS OF FACT
Having heard the testimony presented by the parties and examined the exhibits admitted to evidence, the Court makes the following findings of fact. The defendants are Cheryl A. Gauthier and CAG Land Corp. and CAG Hospitality Corp., two corporations of which Gauthier is president and sole shareholder.[1] The corporate defendants are the owners of Cher's Restaurant, located at 86 Waterman Avenue in North Providence, Rhode Island. The defendants listed this property with Caetano, a real estate brokerage, for the purpose of selling it. Gauthier[2] and Gloria Donnelly, for Caetano, signed a written listing agreement which, regarding the broker's commission, provides that "if [Caetano] procure[s] a buyer, or if the subject property is sold by you, by me, or by anyone else, during the term of this Agreement, [Seller] will pay [Caetano] a fee of 6%." (Third Party Def.s' Ex. A.) The term of the listing agreement was February 13, 2003 through August 31, 2003. Id.
In March of 2003, Plaintiff Normandin made an offer on the subject property and paid $1,000 earnest money to Caetano as escrow agent. (Pl.'s Ex. 1, 12.) On May 8, 2003, Normandin entered into a purchase and sale agreement with Defendant Gauthier as president of CAG Land Corp. and CAG Hospitality Corp. (Pl.'s Ex. 1.) The purchase price of the property was set at $475,000 which did not include the price of the liquor license and certain equipment, for which Normandin agreed to pay an additional $75,000. At that time, he also paid a $27,500 deposit on the property to Caetano as escrow agent. (Pl.'s Ex. 12.) The parties agreed that the deposit was to be credited to the buyer at closing or refunded if the seller or buyer terminated the purchase and sale agreement according to its terms. (Pl.'s Ex. 1.)
The defendants, in the purchase and sale agreement, represented and warranted to the plaintiff that to the best of their knowledge they had not used the property "to treat, deposit, store, dispose of or place any Hazardous Substances," including any substance "which contains petroleum products or petroleum by-products." (Pl.'s Ex. 1 at 4-5.) The defendants further warranted that "to the best of [their] knowledge, there are no underground storage tanks, in, on, under, or about the property." Id. at 6.
The closing date was set for the later of thirty days after the expiration of the inspection period or thirty days after the approval of the transfer of the liquor license. (Pl.'s Ex. 1 at 6.) The plaintiff was given a forty-five day period in which to inspect the premises and perform rodent, pest, and environmental tests. Id. at 7. However, by an extension agreement ("first extension") executed on August 7, 2003, the parties agreed that the closing date would be extended to September 6, 2003; the plaintiff tendered consideration for the modification in the amount of $27,500. (Pl.'s Ex. 2.) This was paid to the defendants' attorneys rather than Caetano. (Pl.'s Ex. 12.) This first extension recited that the payment was only to be credited toward the purchase price if the closing took place within the extended time period and that it was not to be construed as a deposit. (Pl.'s Ex. 2.) On September 5, 2003, Pitney Bowes Small Business Lending issued a commitment latter to Normandin for the amount of $300,000 to finance his purchase of the property; on September 12, 2003, Pawtucket Credit Union likewise issued a letter of commitment to Normandin in the amount of $250,000. (Pl.'s Ex. 7.) Also on September 12, 2003, the parties executed a second extension of their purchase and sales agreement ("second extension"). (Pl.'s Ex. 3.) This document superseded the first extension and set the closing date for September 30, 2003, reciting that "Time is of the essence." Id. It provided that the extension was not contingent on any financing commitments made to buyer and did not affect any parties' rights regarding the deposit under the purchase agreement. Further, Normandin agreed to pay an additional $10,000 consideration for the second extension, as well as certain other costs, not to constitute a deposit or penalty. Id.
Regarding the sums already paid by Normandin, the second extension provided that
 "In the event that the closing does not take place by the date as provided in this extension, provided such a failure is the fault of the Buyer, then the remainder of the Consideration shall then and there become the property of Sellers without further restriction or condition as additional consideration for this extension and not as a penalty, damages or otherwise in connection with the purchase agreement or the transaction anticipated in that agreement." (Pl.'s Ex. 3, ¶ 6.)
If, however, the failure to close was not the fault of the buyer, the second extension provided that
 "In the event that Sellers are unable to convey title as set forth in the purchase agreement, have acted in bad faith or in the event that any representation or warranty under the purchase agreement has been breached such that, under the terms of the purchase agreement, buyer is not obligated to close, then, and only then, will the payments set forth in this paragraph be returned to Buyer." Id. ¶ 3.
In the meantime, on September 18 and 26, 2003, Puliafico Environmental ("Puliafico"), a consultant hired by Normandin's lender, inspected and evaluated the site for environmental "conditions of concern" relating to the presence of and/or the possible threat of a release of oil or hazardous material on or near the property. (Pl.'s Ex. 7.) Gauthier accompanied the inspector on these visits. Id. at 2. An inspection of the interior of the structure on the property revealed that the building was heated by a natural gas burning furnace in the basement. Id. However, an inspection of the exterior revealed the presence of a vent pipe protruding from the ground, and although Gauthier told the inspector that she did not know what it was connected to, Puliafico indicated in its assessment that the vent pipe was of the type commonly used with underground storage tanks. Id. at 5. In addition, public records indicated that the building was heated with oil. Id. at 3. This information led Puliafico to conclude that there might be an underground fuel oil storage tank on the site that would pose a possible threat to soil and groundwater. Id. The plaintiff's lender suggested that plaintiff conduct a small excavation of the area where an underground tank was suspected to be; the Court credits the plaintiff's testimony that the hole was to be approximately three by five feet. The defendants refused to comply with this request. As a result of this failure, the plaintiff's lenders were unwilling to provide the financing they had committed to. Although the plaintiff was still willing to proceed with the sale, and testified very credibly that he could have obtained financing privately, the defendants refused to go forward with the closing. Gauthier thereafter sought to discover whether an underground storage tank had ever been removed from the subject property by contacting the North Providence Fire Department, as evidenced by a letter dated October 1, 2003. (Defs.' Ex. A.) The North Providence Fire Department indicated it had no records of an underground fuel tank being removed from the defendants' property. Id.
Evidence adduced at trial established that there was an underground fuel storage tank on the subject property, and that it had not been used in well over one year. (Pl.'s Ex. 11 at 3.) The Court takes judicial notice of regulations promulgated by the Rhode Island Department of Environmental Management ("DEM") requiring that if a temporarily closed underground storage tank remains so for over a year, it must be permanently closed. Rules and Regulations for Underground Storage Facilities Used for Petroleum Products and Hazardous Materials, 4A Code R.I. Reg. 12 030 029-46 § 13 (2002). Gauthier was billed $2,929 on April 22, 2004 by Taraco Precision Testing, Inc. for the removal of a one thousand gallon fuel tank and the disposal of over a thousand gallons of heating oil. Id. This was authorized by a Tank Cutting Permit issued by the Division of the State Fire Marshal and an approved application to the DEM. Id. at 6-8. In accordance with DEM regulations, a bill of lading covering the fuel oil and a chain of custody certification were issued.Id. at 9-10.
Based on the evidence presented at trial and the credible testimony of the plaintiff, the Court finds that at the time the purchase and sale agreement was executed, the plaintiff was ready, willing, and able to purchase the subject property; he secured financing and performed all of the tasks necessary to go forward with the sale that he was capable of performing himself. (Pl.'s Ex. 5.) The Court further finds that the defendants — Gauthier personally and the corporate defendants through Gauthier as president — had reason to know of the existence of an underground fuel storage tank on the subject property from at least the time of Puliafico's inspection. Defendant Gauthier's testimony was neither credible nor compelling. It simply did not ring true. The Court credits Normandin's testimony that the defendants refused to allow him, at his own expense, to perform a minor excavation for the purposes of ascertaining the presence of an underground storage tank, and finds that the request was well within the bounds of reasonableness. The Court also finds credible the plaintiff's testimony that the defendants, faced with the plaintiff's concerns regarding the potential environmental cleanup costs of the property, advised him that they did not intend to convey the property to him.
 ANALYSIS
The general rule followed by Rhode Island courts in commercial real estate transactions is caveat emptor; thus, a seller of commercial real estate does not have an affirmative duty to disclose conditions or defects associated with the property to a commercial buyer.Hydro-Manufacturing, Inc. v. Kayser-Roth Corp., 640 A.2d 950, 956 (R.I. 1994) (citing Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.,778 F. Supp. 101, 104-105 (D.R.I. 1991)); see also Eramo v. Condoco,655 A.2d 697 (R.I. 1995). Instead, the burden is on the purchaser to seek information regarding the property. Hydro-Manufacturing, Inc.,640 A.2d at 955. A buyer, notes the Rhode Island Supreme Court,
 "has the option to inspect the property and inquire into possible defects prior to purchase. A seller who does not answer truthfully is liable in an action for misrepresentation. A buyer concerned with the truthfulness of the seller's answer or of possible future liability resulting from a prior owner's actions can seek a reduction in the sale price, seek indemnity from the seller (through a warranty), or walk away from the sale." Id. at 955-56.
In the present case, the defendants expressly warranted in the purchase and sale agreement that to the best of their knowledge, the property had not been used to store hazardous substances, and more, that to the best of their knowledge, there were no underground storage tanks in, on, under, or about the property. Additionally, the agreement provided that "Seller represents, warrants to and covenants with Buyer that the representations, warranties and agreements contained in [the agreement] shall be true as of the Closing Date, and shall survive the Closing."
The facts of the instant case show clearly that the buyer, in the process of exercising and fulfilling his duty to inspect the property and inquire into possible defects, uncovered evidence strongly suggesting that, notwithstanding the above warranties, there was an underground storage tank on the property, potentially storing hazardous substances. It is equally clear that the defendants were aware of this possibility. Gauthier accompanied Puliafico on its inspection tours of the property; from at least this time when the environmental inspector inquired as to the use of the visible vent pipe, Gauthier was on notice of the potential existence of an underground storage tank. That Gauthier had notice of this is also supported by the fact the property was listed in the public records as having oil, not gas heat, and that soon after Puliafico's inspection, she sought information from the North Providence Fire Department and was told that there was no record of a tank being removed from the property.
The plaintiff was reasonable in choosing not to rely on the sellers' warranties — which the defendants had arguably already breached — and in seeking to ascertain the facts of the situation. The defendants' refusal to cooperate with Normandin's request rendered it impossible for Normandin to independently verify the existence or nonexistence of an underground storage tank on the defendants' property. The oft stated justification for retaining the doctrine of caveat emptor in commercial real estate transactions is that "[b]uyers of contaminated land . . . are in a position to protect themselves through contract or by refusing to conclude a transaction." Id. at 956. When a seller refuses to cooperate with a buyer wishing to determine whether the land is contaminated, to adequately protect himself, the buyer may refuse to proceed.
As the courts of a sister state have held
 "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. . . . Conversely, bad faith means more than mere negligence; it involves a dishonest purpose." Barber v. Jacobs, 752 A.2d 430, 435 (Conn.App. 2000) (citations omitted); see also Lajayi v. Fafiyebi, 860 A.2d 680, 687 (R.I. 2004) (citing Dovenmuehle Mortgage, Inc. v. Antonelli, 790 A.2d 1113, 1115
(R.I. 2002) ("Virtually every contract contains an implied covenant of good faith and fair dealing between the parties").
In this case, by refusing to allow the plaintiff to thoroughly inspect the property, while maintaining that there were no storage tanks, the defendants, for their own purposes, injured the plaintiff's right to receive the benefits of their agreement — to buy the property with full knowledge of its condition.[3] The defendants' actions demonstrate a total lack of good faith. See Commonwealth v. Reynolds, 708 N.E.2d 658, 667
(Mass. 1999) ("[Bad faith] means a breach of a known duty through some motive of interest or ill will") (quoting Spiegel v. Beacon Participations, Inc.,8 N.E.2d 895 (Mass. 1937)). The Court concludes that this willful conduct, coupled with the defendants' refusal to conclude the sale, constituted a breach of the implied covenant of good faith and fair dealing in the purchase and sale agreement. See Kahn v. Lischner,275 P.2d 539, 544 (Cal.Ct.App. 1954) (holding that failure to convey property without any just reason or excuse is bad faith) accord Mercer v. Lemmens,40 Cal. Rptr. 803 (Cal . Ct. App. 1967).
 Specific Performance
"The grant of a request for specific performance is not a matter of right but rests within the sound discretion of the trial justice." DePetrillo v. Lepore,
No. 2004-122-A., slip op. at 4 (R.I., filed April 27, 2005) (quoting Thompson v. McCann, 762 A.2d 432, 436
(R.I. 2000), Eastern Motor Inns, Inc. v. Ricci,565 A.2d 1265, 1269 (R.I. 1989)); see also 25 Willistonon Contracts § 67:61 at 419 (4th ed.) (grant of specific performance in sale of land is within discretion of trial court). "It is well established that the party who wishes to avail himself of the unique remedy of specific performance must show that he was ready, able and willing to perform his part of the contract." Gill v. Wagner,813 A.2d 959, 963 (R.I. 2002) (quoting Jakober v. E.M.Loew's Capitol Theatre, Inc., 107 R.I. 104, 114,265 A.2d 429, 435 (1970)). Other requisites for a specific-performance action include: "the existence of a valid underlying contract" and "that the vendee tender the purchase price to the vendor at the [closing date]."Gill, 813 A.2d at 963 (citing 14 Richard R. Powell,Powell on Real Property, § 81.04[1][b] at 81-174-75 (2001)).
The plaintiff has satisfied the Court that at the time he executed the purchase and sale agreement he was ready, willing, and able to complete the sale, and that had the defendants allowed Normandin to further inspect the property, he would have completed the sale at the appointed time. However, the plaintiff has not carried his burden of proving that he was still ready, willing, and able to proceed on the date set for the closing, even without having conducted the requested inspection. That is, the plaintiff did not appear at the appointed place and time to tender the purchase price to the defendants. That this was due to the defendant's wrongful conduct is clear, and serves to absolve the plaintiff of any liability. However, absent such a showing, the Court was left in doubt as to whether the plaintiff was ultimately willing to buy the property without knowing whether it was contaminated by oil.
Because the Court does not find that Normandin has proved by a preponderance of the evidence that he was ready, willing, and able to perform his part of the purchase and sale agreement on the date set for closing, the Court, in its discretion, denies the plaintiff's request for specific performance. See Jakober,107 R.I. at 114 ("It is well established that the party who wishes to avail himself of the unique remedy of specific performance must show that he was ready, able and willing to perform his part of the contract);Eastern Motor Inns, 565 A.2d at 1271 (denying specific performance where Court did not find willingness to proceed). The Court notes that that the equitable remedy of specific performance "is never required but lies within the sound discretion of the trial justice." Id.
 Restitution
The plaintiff has paid $27,500 to Caetano as a deposit, and over $28,500 directly to the defendants in connection with this transaction. Principles of equity instruct that one shall not be permitted to enrich himself unjustly at the expense of another or to receive property or benefits without making compensation therefor. RB Elec. Co. v. Amco Constr. Co., 471 A.2d 1351,1355 (R.I. 1984) (citing Seekins v. King, 66 R.I. 105, 110,17 A.2d 869, 871 (1941)); Guldberg v. Greenfield,146 N.W.2d 298, 301 (1966); Annot., 62 A.L.R.3d § 2 at 294)).
If seeking restitution under quasi-contract for unjust enrichment,
 "a plaintiff must prove three elements. First, a benefit must be conferred pon the defendant by the plaintiff. Second, there must be an appreciation by the defendant of such benefit. Finally, there must be an acceptance of such benefit under such circumstances that it would be inequitable for [the defendant] to retain the benefit without paying the value thereof." RB Elec. Co., 471 A.2d at 1355-56.
Of these elements, "the most significant is that the enrichment to the defendant be unjust." Id. at 1356;see also Landmark Medical Ctr. v. Gauthier, 635 A.2d 1145,1148 (R.I. 1994). Here, the plaintiff conferred a benefit on the defendant amounting to several tens of thousands of dollars. The defendants have actual possession of a substantial portion of these funds and seek to gain possession of the remainder, which are being held in escrow. In return, the plaintiff has received no benefit whatsoever due to the defendants' breach of the purchase and sale agreement. Allowing the defendant to retain the sums paid by the plaintiff would be manifestly unjust under these circumstances.
To the extent that the purchase and sale and extension agreements purport to bar the plaintiff from recovering these sums, they are unenforceable forfeitures.[4]Eastern Motor Inns, 565 A.2d at 1271 ("equity abhors a forfeiture"). As the defendants breached the purchase and sale agreement by refusing to cooperate with the plaintiff's attempts to inspect the property with due diligence and by advising him that they did not intend to proceed with the sale, the Court finds that the defendants have been unjustly enriched and Normandin is entitled to restitution of the deposit paid into escrow as well as the other sums paid to the defendants.
 The Defendants' Counterclaims
The defendants claim entitlement to damages from plaintiff under a theory of slander of title, claiming that they were harmed by the filing of a notice of lis pendens. To recover for slander of title, the defendants must establish that the plaintiff
 "maliciously uttered false statements about their ownership of real estate which resulted in their sustaining an actual pecuniary loss. Malice in the context of a slander-of-title claim is `an intent to deceive or injure.' It is established by showing that a party made a false statement, with full knowledge of its falsity, for the purpose of injuring the complainant(s)." Montecalvo v. Mandarelli, 682 A.2d 918, 923 (R.I. 1996) (citations omitted).
A notice of lis pendens is filed on the public record for the purpose of warning others that the title to the property is being disputed in litigation; the practical effect of such a notice is generally to render the title to the property unmarketable. Id. at 924. If such a notice is filed absent a good faith dispute, a slander of title action may lie. Id. "It is well established that an executory purchase-and-sale agreement vests in the vendee thereof equitable title to the land involved." The buyer's equitable interest in the property entitles him or her to put the world on notice (via a lis pendens) of this pending lawsuit in which they claim title to the disputed property. Gill v.Wagner, 813 A.2d 959, 963 (R.I. 2002). Here, the plaintiff and defendants had signed a purchase and sale agreement; the plaintiff therefore had equitable title to the property. The defendants, who bear the burden of proof on their claim of slander of title, did not present the Court with any credible evidence to show that the lis pendens filed in this case was filed in bad faith, or was filed with an intent to injure or deceive anyone. The defendants' slander of title claim is therefore denied. Id. at 474.
The defendants have also asserted an abuse of process claim against Normandin. Such a claim "arises when a legal proceeding, although set in motion in proper form, becomes perverted to accomplish an ulterior or a wrongful purpose for which it was not designed." Hoffmanv. Metcalf, 851 A.2d 1083, 1090 (R.I. 2004) (quotingButera v. Boucher, 798 A.2d 340, 353 (R.I. 2002)). The elements that must be proven are "(1) the defendant instituted proceedings or process against the plaintiff and (2) the defendant used these proceedings for an ulterior or wrongful purpose that the proceedings were not designed to accomplish." Hoffman, 851 A.2d at 1090
(quoting Butera, 798 A.2d at 353). Here, Normandin did institute a law suit against the defendants; however, the defendants have neither alleged nor presented any evidence that the plaintiff had any purpose other than the proper one of seeking a judicial remedy for an alleged breach of contract. The defendants have not produced the slightest evidence that Normandin had an improper purpose or ulterior motive. Compare Heal v.Heal, 762 A.2d 463, 465 (R.I. 2000) (finding abuse of process where defendant's counterclaim was asserted solely "to make good on his threat to make [his wife's] life `a living hell'") with Wright v. Zielinski,824 A.2d 494, 499 (R.I. 2003) (finding no abuse of process where "no evidence suggested that the plaintiff sued for divorce for any reason other than for the valid purpose of divorcing her husband" or that she "`perverted' the divorce action for some improper, ulterior purpose other than to obtain the divorce itself.") Accordingly, the claim is denied.
 The Third Party Complaint
The defendants have charged Caetano with wrongfully retaining the $27,500 deposit paid to them by Normandin. In addressing this claim, this Court is guided by the well-settled principle that "[u]nless the terms of a written contract are ambiguous, it should be interpreted as a matter of law in accordance with its plain terms." R.I. Depositors Econ. Prot. Corp. v. Coffey Martinelli, Ltd., 821 A.2d 222, 226 (R.I. 2003) (citing Clark-Fitzpatrick, Inc./Franki Foundation Co.v. Gill, 652 A.2d 440, 443 (R.I. 1994)). The purchase and sale agreement signed by Gauthier provides that in case of a dispute, Caetano, the escrow agent, is not required to deliver the deposit to any party, but rather is permitted to hold it until receiving written authorizations signed by the parties; that failing, Caetano is authorized to hold the deposit until the final determination of the parties' rights. (Pl.'s Ex. 1 ¶ 2(b).) The Court finds that Caetano is an intended third party beneficiary of this contractual provision as it is designed to protect the broker in the event of a dispute between the buyer and seller. "If the third party is an intended beneficiary [of a covenant], the law implies privity of contract" and the third party may rely on the contractual terms. Iggy's Doughboys, Inc.v. Giroux, 729 A.2d 701, 706 (R.I. 1999) (quoting Davisv. New England Pest Control Co., 576 A.2d 1240, 1242
(R.I. 1990)).
The parties are embroiled in a dispute over, in part, who is entitled to the $27,500 deposit. By retaining the deposit pending its resolution, Caetano was abiding by the express and unambiguous terms of the purchase and sale agreement. Further, Caetano is not in possession of the funds, having turned them over to the General Treasurer to be held in trust pending the resolution of the dispute, as required by G.L. 1956 §5-20.5-26(a)(1)(v).[5]
Caetano bears no liability for complying with the terms of the contract and the law of this State.
The defendants next charge Caetano with breaching the listing agreement by failing to properly investigate the financial condition of the plaintiff. Without reaching the question of what the plaintiff's financial condition was or is, the Court concludes that this claim is without merit. First, Caetano never assumed an express contractual duty of investigating the plaintiff's financial condition. Furthermore, the law does not impose on a real estate broker the duty to investigate the financial condition of a prospective buyer. "The duty of a broker to his client is `to secure as large a price as he is able for his principal and to inform his principal of all material facts,'" and to act in good faith towards its client. Rushton v. Andersen, 47 R.I. 441,133 A. 805; Caswell v. Coy, 50 R.I. 221, 222 (R.I., 1929). A part of the broker's duty to inform the principal of material facts includes the duty to inform the seller of whatever knowledge the broker has of a prospective buyer's financial position; "or, if he had no knowledge concerning it, to at least have so notified the defendant, in order to give the defendant opportunity to investigate the matter for himself."Butler v. Baker, 17 R.I. 582, 584 (R.I. 1892). The Court finds that the defendants' claim that Caetano had a duty as a broker to investigate the plaintiff's financial condition fails as a matter of law. Further, the defendants have presented no credible evidence that Caetano failed to inform them of material information relating to the plaintiff's financial position or it had no knowledge of it. The defendants' breach of contract claim is therefore denied.
 Third party counterclaim
Alleging that it completed its performance under the listing agreement, Caetano has asserted a counterclaim against the defendants to recover the six percent commission it claims it earned. The listing agreement in this case was a unilateral contract, meaning that the contract evidenced the seller's promise to pay a commission to the broker when the broker fully performed. Judd Realty, Inc. v. Tedesco, 400 A.2d 952, 955
(R.I. 1979). It is well settled in Rhode Island that a real estate broker earns its commission when it procures a buyer that is ready, willing, and able to purchase the property on the seller's terms and at the price offered.Griffin v. Zapata, 570 A.2d 659, 663 (R.I. 1990); JuddRealty, Inc., 400 A.2d at 955 (quoting 1 Corbin,Contracts § 50 at 199 (1963)). "A broker is the effective agent, or the procuring cause, when he is the first broker to interest the prospective purchaser in the property, when he causes such purchaser to inspect or view the property, and when he conducts negotiations concerning a sale thereof with the prospective purchaser." Id. (quoting Rustigian v. Celona, 478 A.2d 187,190 (R.I. 1984) (citing Gettler v. Caffier, 92 R.I. 19,22, 165 A.2d 730, 732 (1960) and Judd Realty, Inc.,400 A.2d at 955). The broker has the burden of proving by a preponderance of the evidence that he produced a buyer who was ready, willing, and able to buy on the seller's terms. Judd Realty, Inc., 400 A.2d at 956. The broker is deemed to have earned its commission at the time the parties enter into a binding contract for purchase and sale. 12B Karl B. Holtzschue et al.,Purchase and Sale of Real Property § 25.04, 25-62 (2002); see Judd Realty, Inc., 400 A.2d at 955-56
(holding that where broker interested a prospective buyer in seller's property and produced to seller a purchase and sale agreement containing seller's terms, signed by buyer, the broker had made out a prima facie case for recovery of a broker's commission).
The listing agreement in this case contains no language indicating any intention of the parties to depart from this general rule and in fact, explicitly provides that Caetano will earn a commission by "procuring a buyer," not when the sale of the property is finally consummated. See Rustigian, 478 A.2d at 190
(R.I. 1984); Judd Realty, Inc., 400 A.2d at 956 (holding that the trial justice erred as a matter of law in construing the term "purchase" to mean "someone who actually purchases the property"). The Court finds that Caetano carried its burden of proof in showing that it interested Normandin in the property, engaged in negotiations on behalf of the defendants, and that the defendants and Normandin entered into a valid contract for the sale of the property. The Court further finds that the defendants wrongfully thwarted the completion of the sale in refusing to cooperate in a reasonable investigation into the condition of the property. The Court therefore concludes that Caetano is entitled to its commission. See Hillis v. Lake, 658 N.E.2d 687, 690
(Mass. 1995) (citing, inter alia, Lewis v. Emerson,462 N.E.2d 295 (1984)) (commission due if closing is prevented "by the wrongful conduct of the seller"); seealso Tristram's Landing, Inc. v. Wait, 327 N.E.2d 727
(1975); compare Capezzuto v. John Hancock Mut. LifeIns. Co., 476 N.E.2d 188 (1985) (when seller has not agreed to sell to broker's customer, no liability for commission unless seller acts in bad faith or engages in other misconduct). As the listing agreement covered only the real estate — not the liquor license or equipment — Caetano is entitled to a six percent fee only on the $475,000 purchase price for the property agreed upon by the parties, amounting to $28,500.
 CONCLUSION
The Court finds that the defendants breached the parties' purchase and sale agreement. However, in its discretion, the Court denies plaintiff's request for an order of specific performance of the purchase and sale agreement as the plaintiff failed to prove by a preponderance of the evidence that, notwithstanding the defendant's failure to cooperate, he intended to proceed with the sale on the date set for closing. The plaintiff is entitled to the restitution of all sums he paid to the defendants and to Caetano as escrow agent relating to the purchase and sale and extension agreements, but no further damages, as none were proven. The defendants' counterclaims against the plaintiff and its requests for sanctions against the plaintiff are denied; their third party complaint against Caetano is also denied. As the dispute over the property has been resolved, the lis pendens shall be removed. Caetano's counterclaim against the defendants seeking recovery of its brokerage commission is granted in the amount of $28,500 as it fully performed under its listing agreement with the defendants. Defendants are to bear the costs of the suit. The parties are directed to submit affidavits to the Court regarding the amount of restitution to which the plaintiff is entitled. The parties shall submit an order for entry consistent with this decision.
[1] The defendants assert that Cheryl Gauthier is not an owner of the subject property and should not have been named a defendant. As she is the sole shareholder of the nominal owners and testified at trial that she in fact owns the property, the Court finds this argument to be without merit. See Judd Realty v. Tedesco, 400 A.2d 952,954 (R.I. 1979) (holding that where a defendant testified that he was the sole owner and shareholder of a corporation holding a piece of property and that there was "no difference" between himself and the corporation, the defendant was not relieved from liability for a broker's commission) (citing Judge v.Roy, 90 R.I. 29, 153 A.2d 522 (1959)).
[2] Gauthier did not sign as president of CAG Land Corp. or CAG Hospitality Corp.
[3] Because the sellers' purposeful conduct stalled the progress of the sale, their reliance on the "time is of the essence" provision in the second extension agreement is misplaced. Here, "the facts and equities of this situation militate against a strict application of the `time is of the essence' clause." Thompson v.McCann, 762 A.2d 432, 438-39 (R.I. 2000) (holding that where sellers' action contributed to parties inability to close on time, trial court's decision not to enforce "time is of the essence" clause was proper).
[4] Although not necessary to the decision, the Court notes that the purchase and sale agreement provided that in the event of default by the seller, "the Buyer shall have the right either (i) to terminate this agreement upon written notice to the Seller, and the Escrow Agent shall return the Deposit to the Buyer, or (ii) pursue its remedies at law or in equity including the right of specific performance." (Pl.'s Ex. 1 at 10.) As the plaintiff chose to pursue its legal and equitable remedies rather than terminate the purchase and sale agreement, the issue of which party is entitled to the deposit must be determined based on principles of law and or equity. In addition, although the first extension agreement recited that the sellers were entitled to retain the consideration paid pursuant thereto if the closing did not take place, this agreement was superseded by the second extension agreement, so there is no controlling contractual provision. Finally, with regard to the sums paid by Normandin by the terms of the second extension, the Court finds that the plaintiff would be entitled to restitution by the terms of that agreement as the defendants acted in bad faith in connection with this transaction as discussed supra.
[5] Section 5-20.5-26(a)(1)(v) provides: "Whenever the ownership of any deposit monies received by a broker or salesperson pursuant to this section is in dispute by the parties to a real estate transaction, the broker or salesperson shall deposit the monies with the general treasurer within one hundred eighty (180) days of the date of the original deposit, those monies to be held in trust by the general treasurer until the dispute is mediated, arbitrated, litigated, or otherwise resolved by the parties."